**EXHIBIT G**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------x
VASILIS AFTOUSHIS and CONSTANTIA AFTOUSHIS,   :

               Plaintiffs,   :
                            Index No.
       -against-   102479/07   :

WONDER WORKS CONSTRUCTION CORP., and
FORTHRIGHT CONSTRUCTION, INC.,   :
 
              Defendants.   :
-------------------------------------------x
FORTHRIGHT CONSTRUCTION, INC.,   :

          Third-Party Plaintiff,   :

       -against-   :

MMG DESIGN, INC., ATY INC., N & C IRONWORKS,   :
INC., O.M.I. CONSTRUCTION CO., INC., and
MONACO CONSTRUCTION CORP.,   :

         Third-Party Defendants.   :
-------------------------------------------x
WONDER WORKS CONSTRUCTION CORP.,   :

       Second Third-Party Plaintiff,   :

       -against-   :

MMG DESIGN, INC., ATY INC., N & C IRONWORKS,   :
INC., O.M.I. CONSTRUCTION CO., INC., and
MONACO CONSTRUCTION CORP.,   :

     Second Third-Party Defendants.
-------------------------------------------x
DATE: May 13, 2008

DEPONENT: Mark Kanevsky

BARRISTER REPORTING SERVICE, INC.
120 Broadway
New York, N.Y. 10271

212-732-8066

EXAMINATION BEFORE TRIAL of the
Defendant/Third-Party Plaintiff, FORTHRIGHT
CONSTRUCTION, INC., by MARK KANEVSKY, taken by
the Plaintiffs, pursuant to Order, held at the
offices of Voute, Lohrfink, Magro & Collins,
LLP, 100 Park Avenue, New York, New York, on May
13, 2008, at 1:00 p.m., before a Notary Public
of the State of New York.

BARRISTER REPORTING SERVICE, INC.

120 Broadway

New York, N.Y. 10271

212-732-8066

---

1
2    A P P E A R A N C E S :
3        LAW OFFICES OF STEVEN NEWMAN
             Attorneys for Plaintiffs
4            65 Broadway
             Suite 825
5            New York, New York 10006
6
         MC CABE, COLLINS, MC GEOUGH & FOWLER,
7    ESQS.
             Attorneys for Defendant/Second
8            Third-Party Plaintiff
             WONDER WORKS CONSTRUCTION CORP.
9            346 Westbury Avenue
             Carle Place, New York 11514
10
11       BY:   MICHAEL SMAR, ESQ.
12
         VOUTE, LOHRFINK, MAGRO & COLLINS, LLP
13           Attorneys for Defendant/
             Third-Party Plaintiff
             FORTHRIGHT CONSTRUCTION, INC.
14           170 Hamilton Avenue
             White Plains, New York 10601-1789
15
         BY:   RALPH F. SCHOENE, ESQ.
16
17       CAMACHO MAURO MULHOLLAND, LLP.
             Attorneys for Third-Party
18           Defendant/Second Third-Party
             Defendant
19           MMG DESIGN, INC.
             350 Fifth Avenue
20           Suite 5101
             New York, New York 10118
21
         BY:   JOSEPH O. TUFFY, ESQ.
22
23
24
25

1
2    A P P E A R A N C E S (Continued):
3        SCUNZIANO & ASSOCIATES, LLC
             Attorneys for Third-Party
4            Defendant/Second Third-Party
             Defendant
5            N & C IRONWORKS, INC.
             8403 13th Avenue
6            Brooklyn, New York 11228
7        BY:   NICHOLAS SCUNZIANO, ESQ.
8
         RIVKIN RADLER, LLP.
9            Attorneys for Third-Party
             Defendant/Second Third-Party
10           Defendant
             MONACO CONSTRUCTION CORP.
11           EAB Plaza
             Uniondale, New York 11556-0111
12
         BY:   FRANK J. GILIBERTI, ESQ.
13
14
15                    xxxxx
16
17
18
19
20
21
22
23
24
25

**Page 5**

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, and in compliance with Rule 221 of the Uniform Rules for the Trial Courts;

THAT the parties recognize the provision of Rule 3115 subdivisions (b), and/or (d). All Objections made at the deposition shall be noted by the officer before whom the deposition is taken, and the answer shall be given and the deposition shall proceed subject to the objections and to the right of a person to apply for appropriate relief pursuant to Article 31 of the CPLR..

THAT every objection raised during a deposition shall be stated succinctly and framed so as not to suggest an answer to the deponent and, at the request of the questioning attorney, shall include a clear statement as to any defect in form or other basis or error or irregularity. Except to the extent permitted by CPLR Rule 3115 or y this rule, during the course of the examination, persons in attendance shall not make statements or comments that interfere with the

**Page 6**

questioning.

THAT a deponent shall answer all questions at a deposition, except (i) to preserve a privilege or right of confidentiality, (ii) to enforce a limitation set forth in an order of a court, or (iii) when the question is plainly improper and would, if answered, cause significant prejudice to any person. An attorney shall not direct a deponent not to answer except as provided in CPLR Rule 3115 or this subdivision. Any refusal to answer or direction not to answer shall be accompanied by a succinct and clear statement of the basis therefore. If the deponent does not answer a question, the examining party shall have the right to complete the remainder of the deposition.

THAT an attorney shall not interrupt the deposition for the purpose of communicating with the deponent unless all parties consent or the communication is made for the purpose of determining whether the question should not be answered on the grounds set forth in Section 222.2 of these rules and, in such event, the reason for the communication shall be stated for the record

**Page 7**

succinctly and clearly.

THAT failure to object to any question or any question or to move to strike any testimony at this examination shall not be a bar or waiver to make such objection or motion at the time of trial of this action, and is hereby reserved; and.

Make such objection or motion at the to any question or to move to strike any testimony at this examination shall not be a bar or waiver All rights provided by the C.P.L.R., including the right to object to any question except as to the form, or to move to strike any testimony at this examination, are reserved; in addition, the failure to object to any question or to move to strike testimony at this examination shall not be a bar or waiver to make such motion at the time of the trial of this action, and is hereby reserved; and,

THAT this examination may be signed and sworn to by the witness examined herein before any Notary Public, but failure to do so or to return the original of the examination to the attorney on whose behalf the examination is taken shall not be deemed a waiver of the rights provided by Rules

**Page 8**

3116 and 3117 of the CPLR, and shall be controlled thereby; and,

THAT certification and filing of the original of this examination are waived; and,

THAT the questioning attorney shall provide counsel for the witness examined herein with a copy of this examination at no charge.

xxxxx

9

1
2  M A R K   K A N E V S K Y,
3       having been first duly sworn before a
4       Notary Public of the State of New
5       York, was examined and testified as
6       follows:
7
8  EXAMINATION BY
9  MR. NEWMAN:
10  Q.    Please state your name for the record.
11  A.    Mark Kanevsky.
12  Q.    What is your address?
13  A.    2681-A East 14th Street, Brooklyn, New
14  York 11221.
15  Q.    Good afternoon, sir.  My name is Steve
16  Newman.  I represent the Plaintiffs in this
17  case.  I'll be asking you a series of
18  questions, and these other lawyers might
19  follow-up if I'm not doing a complete job,
20  but I will try to do that.  I will give you a
21  couple of instructions, standard lawyer talk,
22  before we start.  All of your responses have
23  to be oral.  You can't gesture.  You have to
24  say something.
25       Do you understand what I just said to

10

1                        Kanevsky
2  you?
3  A.    Yes, I do.
4  Q.    If you don't understand what I'm
5  asking you, it's absolutely appropriate and
6  we all want you to say I don't understand.
7       Do you understand what I just said to
8  you?
9  A.    Yes.
10  Q.    Do not guess and do not speculate.
11  We're all here to get information that you
12  know to be true, and it doesn't help any of
13  us if you're guessing and/or speculating.
14       Do you understand what I just said to
15  you?
16  A.    Yes.
17  Q.    When I'm asking you a question, please
18  hold off giving an answer until I finish the
19  question.  That it makes the court reporter's
20  job easier if you wait to speak after I
21  finish my question.
22       Do you understand?
23  A.    Yes, I do.
24  Q.    Are you taking any prescription drugs
25  or any kind of drugs or alcohol that would

11

1                        Kanevsky
2  prevent you from answering my questions
3  today?
4  A.    No.
5  Q.    Have you been deposed before, sir?
6  A.    No.
7  Q.    Are you currently employed?
8  A.    Yes.
9  Q.    Where do you work?
10  A.    I'm self-employed.
11  Q.    How long have you been self-employed?
12  A.    More than ten years.
13  Q.    Do you have an office that you work
14  out of?
15  A.    Yes, I do.
16  Q.    Where is the office located?
17  A.    2681 East 14th Street, I believe.
18  Q.    That's a commercial space?
19  A.    Yes.
20  Q.    That's in Brooklyn?
21  A.    Yes.
22  Q.    How long have you been in that space?
23  A.    A few months.
24  Q.    Where were you before?
25  A.    At McDonald Avenue.

12

1                        Kanevsky
2  Q.    Could you give the address, please, if
3  you remember?
4  A.    2685.  No.  I don't remember the
5  number 2685.  McDonald.  Corner of Avenue U.
6  Q.    How long were you at that office?
7  A.    About four years.  Four or five I
8  would say.
9  Q.    In the office that you're at now do
10  you have any employees that you pay?
11  A.    Yes, I do.
12  Q.    What are their roles?  What do they
13  do?
14  A.    They're office employees.
15  Q.    How many are there?
16  A.    Today?
17  Q.    Yes.
18  A.    Two.
19  Q.    What are their names?
20  A.    Jane.
21  Q.    What's the last name?
22  A.    I don't remember.
23  Q.    What's your other employee's name?
24  A.    Myself.
25  Q.    So, there's not two other employees,

13

Kanevsky

1
2    there's one other employee besides yourself?
3    A.    I would say opposite.
4    Q.    It's a simple question, and I want to
5    move the deposition along.
6          Aside from yourself --
7    A.    I'm not a president of the company.
8    So --
9    Q.    I didn't ask you anything about you
10   being the president of the company or
11   anything about that. All I asked was, aside
12   from yourself, are there any employees in the
13   office space that you occupy that you pay?
14   What is the answer to that question?
15   A.    Today only one person, Jane.
16   Q.    What does Jane do?
17   A.    Secretary.
18   Q.    How long has she been your secretary?
19   A.    Five years.
20   Q.    What are her duties as your secretary?
21   What does she do for you?
22   A.    All paperwork.
23   Q.    How many hours a week does she work?
24   A.    40 hours.
25   Q.    She's a salaried employee of yours?

14

Kanevsky

1
2    A.    Yes.
3    Q.    You're self-employed. What is it that
4    you do, sir?
5    A.    What do I do?
6    Q.    Yes.
7          How do you make a living?
8    A.    I'm a construction manager.
9    Q.    How long have you been a construction
10   manager?
11   A.    More than ten years.
12   Q.    In the last year have you been working
13   as a construction manager?
14   A.    Yes, I do.
15   Q.    Where have you been working in the
16   last year as a construction manager?
17   A.    I have a few projects.
18   Q.    Where are they?
19   A.    All of them in Brooklyn.
20   Q.    Can you give me the locations -- this
21   is the last year -- where you have worked as
22   a construction manager?
23   A.    Excuse me?
24   Q.    In the last year --
25   A.    Location?

15

Kanevsky

1
2    Q.    Here's my question. We'll do it this
3    way.
4          In the year 2008 from January to May
5    have you worked as a construction manager
6    anywhere?
7    A.    Yes, I do.
8    Q.    Where have you worked as a
9    construction manager?
10   A.    I do not understand your question.
11   Q.    The question is the following.
12         From January 1st of 2008 have you worked anywhere? Have you
13   of 2008 have you worked anywhere? Have you
14   been employed anywhere as a construction
15   manager?
16   A.    I'm self-employed. How can I be
17   employed?
18   Q.    You're self-employed. What does that
19   mean when you say self-employed? Does
20   anybody hire you for work?
21         MR. NEWMAN:  I'll do it another
22   way.
23         MR. GILIBERTI:  Ask him if he's
24   with Forthright.
25         MR. NEWMAN:  I'll do that in a

16

Kanevsky

1
2    second. I'm trying to understand
3    what's happening.
4    Q.    From January of 2008 to May of 2008
5    have you made any money working as a
6    construction manager?
7    A.    Yes, I do.
8    Q.    Who's paid you from January to May for
9    your work?
10   A.    My clients.
11   Q.    Who are the clients that have paid you
12   to be a construction manager? From January
13   of 2008 through May of 2008 who has paid you
14   money?
15   A.    I prefer to keep the answer private.
16   It's not related to this job.
17         MR. NEWMAN:  That's not
18   appropriate. It's not legal. We'll
19   call the judge right away. He doesn't
20   have the right. You know that.
21         MR. SCHOENE:  Explain to me the
22   relevance of this question.
23         MR. NEWMAN:  Again, we all know
24   the rules have been clarified.
25   Relevancy is not an objection.

17

```
 1                 Kanevsky
 2          MR. SCHOENE:  Palpably
 3    irrelevant is.
 4          MR. NEWMAN:  Do you consider
 5    this palpably irrelevant when I'm
 6    asking him what he's doing?
 7          MR. SCHOENE:  You're asking him
 8    who's paying him.
 9          MR. NEWMAN:  I'll call the
10    judge.
11          Here's the question.  I need it
12    on the record if you're instructing
13    him not to answer.
14    Q.    The question is, sir, who has paid you
15    money to be a construction manager?  From
16    January of 2008 to May of 2008 who has paid
17    you?
18          MR. NEWMAN:  For the record, are
19    you instructing your client not to
20    answer the question?
21          MR. SCHOENE:  You want to call
22    the judge?  He feels it's an invasion
23    of his privacy to answer that
24    question.  I asked you to explain the
25    relevancy of it.  You said relevancy
```

18

```
 1                 Kanevsky
 2    is not an objection.  I said if it's
 3    palpably irrelevant, it is.  This
 4    seems to me it is palpably irrelevant.
 5    Unless you can explain to me the
 6    relevancy --
 7          MR. NEWMAN:  I don't have to.
 8    That's as clear as any of the rules.
 9          MR. SCHOENE:  Now you're abusing
10    the rules.
11          MR. NEWMAN:  No problem.  It's
12    not a problem.
13          MR. SCHOENE:  You're abusing the
14    rules by not explaining to me the
15    relevancy.
16          MR. NEWMAN:  Off the record.
17          (Discussion held off the
18    record.)
19          (Brief recess taken.)
20    Q.    Sir, what we're going to do is I
21    called the court to get a ruling on this
22    issue.  I'm going to move beyond it and see
23    if I can work around this, and then we'll
24    proceed.  When the judge is back, then we'll
25    call the judge to see what's up.
```

19

```
 1                 Kanevsky
 2          In the year 2008 have you been
 3    employed by anyone?
 4    A.    No.
 5    Q.    In the year 2008 have you made any
 6    money working as a construction manager?
 7    A.    Let me ask a question, please.
 8    Clarify for me what means employed and make
 9    money.
10    Q.    Not a problem.
11          Make money is when you do some work
12    and then the person you've worked for either
13    gives you U.S. currency or they give you a
14    check or money order.
15          Has anyone done that for you in the
16    year 2008?
17          That's what make money means.
18    A.    Let me ask you again.  What is the
19    difference between being employed and being
20    paid?
21    Q.    I'll explain that, but let me ask you
22    a question.
23    A.    You can't ask me a question until you
24    explain to me your question.
25    Q.    Do you need a translator, Russian
```

20

```
 1                 Kanevsky
 2    translator?
 3    A.    No, I don't.
 4    Q.    Here's how it works, and then I'll
 5    clarify.  This is a deposition and I get to
 6    ask you questions and then you give answers.
 7    If you don't understand my question, you can
 8    say I don't understand and I'll rephrase it.
 9          MR. NEWMAN:  So, let's do it
10    again.  Why don't you recite the
11    question, and then we'll see what the
12    gentleman doesn't understand.
13    Whatever my last question is, read
14    that back to him, and let's see where
15    we're at.
16          (Whereupon the record was read
17    back by the reporter.)
18    Q.    So, your question to me is, what does
19    the word employed mean?
20    A.    You asked me a question, did I make
21    money and was I employed.
22    Q.    Yes.
23    A.    What's the difference between those
24    two?
25    Q.    Making money is what I said a moment
```

21

Kanevsky

age. When you work for someone and they pay
you for your labor, that's what making money
is in the context I'm asking.

Have you worked in the year 2008 as a
construction manager where somebody paid you
for your labor? That's the question.

A.      I don't understand this question.
This question is not related to the job that
I do. It's not about my work.

        MR. NEWMAN: Off the record.

        (Discussion held off the
        record.)

        MR. NEWMAN: First of all, this
        witness is not answering questions.
        This is my deposition. He does not
        seem to have been instructed on what
        is happening today. He appears to be
        utterly recalcitrant in answering the
        simplest question.

        Number two, he is, I guess, not
        been prepped, because rather than
        responding to my questions or telling
        me I don't understand the question,
        he's asking me questions.

22

Kanevsky

Number three, I have been
instructed about the tone of my voice,
and I don't think there are any rules
that prevent me from adopting whatever
tone that I deem appropriate if I have
a recalcitrant witness.

Now I will change my tone, and
ask you, the attorney representing
this gentleman, what do you want to
do, sir, about this gentleman who
refuses to answer the simplest
question that I can possibly ask? As
an example, he just asked me what does
it mean to make money, and I don't
know where to go with that, and I need
some help from you as to what to do
with this gentleman.

        MR. SCHOENE: First of all,
        there are rules of civility, which you
        have -- that's right. You're about to
        interrupt me again. Every time I
        tried to say something when we were
        off the record, you did not let me say
        what I wanted to say. You interrupted

23

Kanevsky

me. You came into this deposition in
an aggressive manner, very
confrontational, and it seems to me
you started asking questions at this
deposition, which in my opinion were
palpably improper, and it's almost
like you want to create some kind of
controversy and put it in front of a
judge, which I don't understand. If
the witness does not understand a
question that is posed by you -- and I
may remind you that you instructed
this witness that if he did not
understand the question, you invited
him -- more than invited him, you
encouraged him to bring that to your
attention so the question could be put
in another form, and now you don't
like it that he's doing that.

        You can go ahead and ask the
question. If he understands the
question, he'll give you an answer.
If he does not, he will not give you
an answer.

24

Kanevsky

        MR. NEWMAN: Thank you for the
        clarification.

Q.      I want it on the record. I'm asking
you a second time. Is there anything about
the English language that I'm speaking to you
in that prevents you from answering? Do you
have any language problem whatsoever?

A.      No.

        MR. NEWMAN: We'll proceed.

Q.      In the year 2008 have you made any
money as a construction manager?

A.      Yes, I do.

Q.      Who paid you or what work did you do
to get paid as a construction manager in the
year 2008?

        MR. SCHOENE: Objection. That's
        a compound question. You have two
        parts in there. I'm not sure which
        question you're asking.

        MR. NEWMAN: No problem.

Q.      Who employed you in the year 2008 to
work as a construction manager?

A.      I'm not going to give you a list of my
clients. This is private.

25

Kanevsky

MR. SCHOENE: That's what you
said you were going to put on the
shelf and continue with your
deposition.

MR. NEWMAN: That's a different
question.

MR. SCHOENE: That's exactly
what you asked the first time around
when you picked up the phone to call
the judge, and you said you were going
to put it on the shelf and continue
on, and then you went right back to
it.

Q.   Sir, are you a principal of Forthright
Construction, Inc.?

A.   Yes, I do.

Q.   How long have you been a principal of
Forthright Construction, Inc.?

A.   About four or five years.

Q.   When you say about four or five years,
are you clear in your mind whether it's four
years or five years or you're not sure?

MR. SCHOENE: Objection to the
form. You may answer.

---

26

Kanevsky

A.   I don't pay attention to this number.
Approximately four or five years.

Q.   When you say you are a principal of
Forthright Construction, Inc., what does that
mean?

A.   I'm a vice-president.

Q.   Have you been a vice-president of
Forthright Construction, Inc. for four or
five years?

A.   Yes.

Q.   Do you hold any other positions in
Forthright Construction, Inc.?

A.   No.

Q.   What do you do as a vice-president of
Forthright Construction, Inc.?

A.   Everything that I'm suppose to do as a
vice-president.

Q.   What is that?

A.   Can you clarify your question, please?

Q.   What do you do? What is your job as
the vice-president of Forthright
Construction, Inc.?

A.   I have too many responsibilities.

Q.   Okay.

---

27

Kanevsky

What are they?

A.   They're related to Quentin Terrace
project.

Q.   What job functions are related to
Quentin Terrace project? What do you do?

A.   As vice-president I oversee the
project from the very beginning stage. Then
in the construction stage I do interfere with
people who are involved in the design, as the
architects and engineers, and also the
subcontractors who do the actual work.

Q.   When you say that you oversaw or
oversee the project on Quentin Road, what
does that involve? What have you done?

A.   Physically oversee the project. Be on
the job site, look exactly at what's going on
at the job site, have a report from my
supervisors. Control everything that's going
on at the job site. You can put it in one
word, everything.

Q.   When did you start to oversee the
project on Quentin Road?

A.   In the very beginning.

Q.   Which was when?

---

28

Kanevsky

A.   2004.

Q.   Now, in 2004 was Forthright
Construction, Inc. the general contractor, a
subcontractor? What was their role for the
construction project at Quentin Road?

A.   I would say general contractor.

Q.   What was Wonder Works in relation to
Forthright?

A.   Wonder Works is a general contractor
on the same job.

Q.   So, your testimony is that there were
two general contractors working the job on
Quentin Road; is that correct?

A.   You can say so.

MR. NEWMAN: Let's have this
marked as Plaintiff's Exhibit 1.

(Whereupon a photograph was
marked Plaintiff's Exhibit 1, for
identification as of this date.)

Q.   Sir, I'm showing you what has been
marked as Plaintiff's 1, and this is a
photograph of a sign. I'm asking you have
you ever seen that sign before?

A.   Yes.

29

Kanevsky

2  Q.    When's the first time you saw that
3  sign?
4  A.    Always.
5  Q.    Have you seen it in the year 2004?
6  A.    Yes.
7  Q.    Who put up that sign?
8  A.    I did.
9  Q.    When did you put that sign up?  When
10 did you physically put that sign on the site
11 at Quentin Road?
12 A.    On the construction fence.
13 Q.    You put it on the construction fence?
14 A.    I did.
15 Q.    You did that in the year 2004?
16 A.    I believe so.  Around that time.
17 Q.    On the sign it says that Wonder Works
18 Construction Corp. is the general contractor,
19 correct?
20 A.    Yes.  Correct.
21 Q.    Then it says contractor is Forthright
22 Construction, Inc., correct?
23 A.    Correct.
24 Q.    So, who created this sign?
25 A.    I did.

30

1  Kanevsky

2  Q.    Where it says contractor, Forthright
3  Construction, Inc., does that mean something
4  other than what you said before?  I'm just
5  trying to get clarification.  In other words,
6  should that read general contractor,
7  Forthright Construction, Inc., or is that a
8  mistake, or what is this sign about?  Because
9  it's slightly different from what you said.
10 I just need clarification.
11        MR. SCHOENE:  Objection to form.
12     That's mostly a statement rather than
13     a question.
14        MR. NEWMAN:  Let me rephrase it.
15 Q.    Was Forthright Construction, Inc. the
16 general contractor on the job at Quentin Road
17 or a contractor on the job?
18        MR. SCHOENE:  Objection to form.
19     You said the general contractor.  The
20     witness said there might be two
21     general contractors.
22        MR. NEWMAN:  Let me change the
23     question.
24 Q.    Was Forthright Construction, Inc. a
25 general contractor performing work on Quentin

31

1  Kanevsky

2  Road or a contractor performing work on
3  Quentin Road?
4  A.    May I ask a question, please?
5        MR. SCHOENE:  Are you able to
6     answer the question?
7        THE WITNESS:  Not this question.
8     I have to clarify something.
9  Q.    What's the question?
10 A.    The question is, what is the
11 difference between general contractor and
12 contractor in your opinion?
13 Q.    Here's the deal.  If you don't
14 understand my question --
15 A.    I understand.
16 Q.    Here's the deal.  You don't get to ask
17 me questions.  You're here only for one
18 reason.  It's to respond to questions that
19 I'm asking you.  The only thing you can do is
20 you can say I don't understand, but you don't
21 get to ask me questions.  If you want me to
22 clarify my question, which I think you're
23 asking me to do, I'll be happy to do so.
24        MR. SCHOENE:  Madam Reporter,
25     I'd like to know if when the witness

32

1  Kanevsky

2  said may I ask a question, did Mr.
3  Newman respond to that?  Did he say
4  yes or no, or was there a response?
5        (Whereupon the record was read
6     back by the reporter.)
7        MR. SCHOENE:  After that lecture
8     that Mr. Newman gave the witness, I
9     think the record will reflect that Mr.
10    Newman invited a question from the
11    witness, and then he goes ahead and
12    tells the witness he's not suppose to
13    ask questions.  I think there should
14    be more consistency on the part of Mr.
15    Newman.
16        MR. NEWMAN:  You're right.  I
17    have been inconsistent.
18 Q.    Now I'll try to be more consistent in
19 the way I'm questioning you, sir.  I'll ask
20 it this way.
21        There's a sign that I just pointed out
22 to you that's depicted within what's been
23 marked as Plaintiff's 1, and it lists
24 Forthright Construction, Inc. as a
25 contractor.

33

Kanevsky

Now I'll ask you this question.

Is there a difference in your mind between Forthright Construction, Inc. working as a contractor or Forthright Construction, Inc. working as a general contractor on Quentin Road?

A. Yes.

Q. What's the difference?

A. The difference is who is legally holding the permits on the job site and who is doing any work on the job site, all of it or partial work. That's the difference in my understanding.

Q. Well, who held the permits on Quentin Road, Wonder Works or Forthright?

A. Wonder Works.

Q. Does that mean under the definition you're giving me that Wonder Works was the general contractor because they held the permits?

A. You can say so.

Q. It's not me saying so. I'm asking you what you say. I'm not asking about my opinion. I'm asking your opinion.

---

34

Kanevsky

I'll ask you the question again, sir.

In that you just testified that Wonder Works Construction Corp. held the permits for the job on Quentin Road, does that mean under your definition that Wonder Works was the general contractor doing the work on Quentin Road?

A. Wonder Works has the permits for the new building on Quentin Road, and Wonder Works as the general contractor may have subcontractors or general contractors for the actual work.

MR. NEWMAN: I move to strike the answer as not responsive.

Can you read back the question, please?

(Whereupon the record was read back by the reporter.)

MR. NEWMAN: I will do it another way.

Q. From your testimony you're saying Forthright Construction, Inc. did not take out any permits for the work on Quentin Road? Is that your testimony?

---

35

Kanevsky

A. Excuse me?

Q. Did Forthright Construction, Inc. apply for any permits to do construction work on Quentin Road?

A. I don't remember. I think not. I believe not. I believe not.

Q. Is the reason that Forthright Construction, Inc. did not take out any permits because they were not the general contractor on the job?

A. There's no reason. It was just the way the job was set up.

Q. It's your testimony that there are two general contractors that performed work on Quentin Road, Wonder Works Construction Corp. and Forthright Construction, Inc.?

MR. SCHOENE: Objection to the form. You may answer.

A. May I ask a question again?

MR. SCHOENE: He doesn't want you to ask questions.

THE WITNESS: I don't understand.

MR. SCHOENE: Tell him you don't

---

36

Kanevsky

understand the question that he's posing. He's made it very clear he doesn't want any questions from you.

MR. NEWMAN: I don't.

MR. SCHOENE: If you don't understand the question, just say you don't understand question.

A. I don't understand the question.

Q. Previously you testified that Wonder Works Construction Corp. and Forthright Construction, Inc. were both performing and working as general contractors doing the work on Quentin Road. Do you remember saying that a couple of minutes ago?

MR. SMAR: Objection. That's not what he said. You said working as general contractors at the construction site. There's really no definition of what general contractor is, and it does call for a legal conclusion to some extent.

Q. What did you do in overseeing the project on Quentin Road?

A. Construction management.

Kanevsky

2  Q.    What did that entail?  What are the
3  specifics that you did?  What are the
4  specifics that you did starting from 2004?
5  A.    I already answered this question.  I
6  oversee the whole project.
7  Q.    What did that entail?  What did you
8  do?
9  A.    I oversee the whole project.  I
10  physically built the building.
11  Q.    You physically built the building?
12  A.    That's what it means.
13  Q.    Take me through that.
14       When you say you physically built the
15  building, were you responsible for doing the
16  excavation?
17  A.    Yes, I do.
18  Q.    Were you responsible for doing the
19  underpinning?
20  A.    Yes, I do.
21  Q.    Were you responsible for building --
22       MR. SCHOENE:  I'll make an
23  objection to the word responsible.
24  I'm not sure what you mean by that
25  word.  I will not direct him not to

---

Kanevsky

2  answer, but I object to form as to
3  what responsible means.
4       MR. NEWMAN:  Okay.
5  Q.    Let me ask you this.
6       What did you do in terms of excavating
7  the ground adjacent to 97 Quentin Road?
8  A.    I already told you.  I already
9  explained.  I physically oversee the whole
10  project on the job site.  If somebody did the
11  actual work, I was there to check and make
12  sure the job was done accurately.
13  Q.    When it came to excavation of the
14  ground adjacent to 97 Quentin Road, who did
15  you oversee?
16       I'll ask it again.
17       Was there a company or an individual
18  that excavated the ground next to 97 Quentin
19  Road?
20  A.    Everybody who used to be on the
21  project was under my supervision.
22       MR. SCHOENE:  He wants to know
23  who did the excavation.
24  Q.    Who did the excavation?
25  A.    ATY.

---

Kanevsky

2  Q.    Is it ATY, Inc.?
3  A.    ATY, three letters, I believe.
4  Q.    Who hired ATY?
5  A.    I did.
6  Q.    When did you hire them?
7  A.    I believe it was the end of 2004.
8  Something like that.
9  Q.    What was the process of you hiring
10  them?  How did you find them?
11  A.    Because they used to work with me on a
12  previous project.  I knew him from before.
13  Q.    When you said him, was it one person
14  that you dealt with?
15  A.    Two.
16  Q.    Two people, is that what you just
17  said?
18  A.    Two people.
19  Q.    What were their names?
20  A.    One was Izzy, short for Isaac, and
21  another one was -- I forgot his name.
22  Q.    If you don't remember, just say you
23  don't remember.  We'll move on.
24       Did you enter into a contract with ATY
25  Inc.?

---

Kanevsky

2  A.    Yes, I did.
3  Q.    Do you recall what did you contract
4  with ATY Inc. to do at Quentin Road?
5  A.    Original contract was started from
6  excavation and foundation.  We also extend
7  this contract to underpinning and shoring.
8  Q.    When did ATY Inc. begin to work on the
9  project?  When I'm talking about the project,
10  I'm talking about the work being performed
11  adjacent to 97 Quentin Road.
12  A.    I believe it was the end of 2004.  I'm
13  not sure.
14  Q.    Before ATY Inc. began to perform work
15  somewhere around the end of 2004, was there
16  any other work that was performed at the site
17  adjacent to 97 Quentin Road?
18  A.    I don't think so.
19       MR. SCHOENE:  Do you mean by
20  other companies before that?
21       MR. NEWMAN:  No.  Just any work.
22       MR. SCHOENE:  By ATY you said.
23       MR. NEWMAN:  No.  I will clarify
24  now.
25       MR. SCHOENE:  I think the answer

11

                        Kanevsky
1
2    will be different depending on the
3    question.
4              MR. NEWMAN:  I think Counsel is
5         right, that I'm not being clear
6         enough.
7    Q.    I'm simply asking, was the first work
8    done adjacent to 97 Quentin Road excavation
9    work?
10   A.    No.
11   Q.    What was the very first work that was
12   done adjacent to 97 Quentin Road?
13   A.    Demolition.
14   Q.    Fair enough.
15         Who performed the demolition work?
16   A.    MMG.
17   Q.    MMG Design?
18   A.    MMG Design.
19   Q.    Who contracted with them?
20   A.    I did.
21   Q.    Did you literally enter into a written
22   contract with them, them being MMG Design,
23   Inc.?
24   A.    Yes.
25   Q.    When was that?

12

                        Kanevsky
1
2    A.    We contracted with them for the
3    demolition.
4    Q.    My question is, sir, when did you
5    enter into a contract with --
6    A.    I don't remember.
7    Q.    Let me get the question out.
8         When did you contract with MMG Design,
9    Inc.?
10   A.    I don't remember the date.  I believe
11   it was the beginning of 2004.  Probably
12   February.
13   Q.    Was that the first work that needed to
14   be done on the site adjacent to 97 Quentin
15   Road?
16   A.    Physically, yes.
17   Q.    How long did it take to do the
18   demolition work?
19   A.    I don't remember.  A few months.  A
20   month or two.
21   Q.    Any problems in doing the demolition
22   work?
23   A.    No.
24   Q.    You just said a moment ago that was
25   the first physical work that was done.  What

13

                        Kanevsky
1
2    was the planning or the architectural work
3    that had to be done?  Did you hire an
4    architect?
5    A.    No.
6    Q.    Did anybody hire an architect?
7    A.    Yes.
8    Q.    Who?
9    A.    Wonder Works.
10   Q.    Wonder Works.
11        Do you know when Wonder Works hired an
12   architect?
13   A.    When?
14   Q.    When?
15   A.    No, I don't.
16   Q.    Do you know who the architect was for
17   the project?
18   A.    Yes.
19   Q.    Who?
20   A.    Karl Fischer.
21   Q.    Was he the only architect that worked
22   on the job?
23   A.    Architect, yes.
24   Q.    Any professional engineers that worked
25   on the job?

14

                        Kanevsky
1
2    A.    Yes.
3    Q.    What were those firms or that firm?
4    A.    I have a list of them.  I don't
5    remember them.
6    Q.    Do you remember any of them?
7    A.    The engineer on the job was -- I'd
8    have to look in my records.
9    Q.    If you don't recall, that's not a
10   problem.  Just say I don't remember, and
11   we'll move on.
12        Is it fair to say there was more than
13   one professional engineer who worked on the
14   job?
15   A.    Yes.
16   Q.    Can you tell me about how many
17   professional engineers worked on the job?
18             MR. SCHOENE:  I need
19        clarification.  When you say
20        professional engineers, are you
21        talking about different entities or
22        professional engineers that work for
23        one concern?
24   Q.    Different engineering firms, was there
25   more than one?

45

Kanevsky

A.    More than one.

Q.    What was the reason why there was more than one engineering firm?

A.    This is standard procedure. They're responsible for different parts of the project.

Q.    What different parts of the project required different engineers?

A.    Structural, mechanical, foundation, electrical. Different engineers work on the project.

Q.    Is it your testimony that there were different engineering firms that took care of the different categories that you just referred to?

A.    Yes.

Q.    Was there a professional engineering firm for the excavation?

A.    For the underpinning and the shoring.

Q.    Do you recall who that engineering firm was?

A.    It's an engineering firm in New Jersey. The first name is Aislem.

Q.    Did you have any interaction with that

46

Kanevsky

engineering firm, the one that you just testified to that was in charge of the underpinning?

A.    Yes, I do.

Q.    What was the nature of your interaction with that engineering firm?

A.    Explain to him my problem on the job site which was not in the original project.

Q.    Tell me what the problem was on the job that was not in the original project.

A.    We have the foundation work that was supposed to be demolished. It's on another side of the building, of your building. It's not related to your side, which we decide to keep in the ground. So, we need to support that foundation. That's why we did special project for the shoring of that part of the wall.

Q.    If I give you a piece of paper, can you diagram what that is?

Is it fair to say, sir, that really has nothing to do with 97 Quentin Road?

A.    I believe so.

Q.    Nothing to do with it?

47

Kanevsky

A.    I believe so.

Q.    Take a minute. We'll do it quickly, and just diagram 97 Quentin Road anyway you want to do it, but just orient us.

A.    This is our job site. This is your building. Right here we used to have a foundation. In order to demolish it -- that property had a garage or something. It was very difficult to see. So, we left that piece of the foundation wall.

Q.    All right. I understand.

A.    Then we changed the design of our building. Our wall and the new wall went this way. That was the main reason why we had to interface with that engineer.

Q.    Sir, I'll ask it this way.

Were there any issues or problems having to do with the underpinning or shoring or excavation in the area bordering the building that was at 97 Quentin Road? Any issues?

A.    No issues. No problem. Just standard underpinning work.

Q.    Did you see the underpinning being

49

Kanevsky

constructed?

A.    Sure.

Q.    What company did the underpinning?

A.    ATY.

Q.    How long did it take for ATY to do the underpinning?

A.    I don't remember. It took a few months.

        MR. SCHOENE: May I just interject?

        Was there more than one company that did underpinning?

        THE WITNESS: Yes. We started with Monaco. They worked with us for two or three days, and that's it. They didn't work anymore over there.

        MR. NEWMAN: Let's mark the diagram as Plaintiff's Exhibit 2.

        (Whereupon a diagram drawn by Mr. Kanevsky was marked Plaintiff's Exhibit 2, for identification as of this date.)

Q.    Are you familiar with a company named Monaco Construction Corp.?

49

Kanevsky

A.  Yes, I do.

Q.  Did you hire them to do any work on the land adjacent to 97 Quentin Road?

A.  I did not.

Q.  Who hired them?

A.  MMG Design.

Q.  What's the name of the company that did the initial excavation work on the land adjacent to 97 Quentin Road?

A.  ATY.

Q.  Did Monaco Construction Corp. do excavation work?

MR. GILIBERTI:  Objection to form.

A.  Never.

Q.  Never.

Were they hired to do excavation?

A.  We have a contract with them, MMG, and they hired Monaco.

Q.  What was your contract with MMG Design for?

A.  Excavation.

Q.  Did you hire MMG Design to do excavation prior to hiring ATY Inc. to do

50

Kanevsky

excavation?

A.  Yes, I do.

Q.  Did you personally recruit or contract with MMG Design to do the work adjacent to 97 Quentin Road?

A.  Yes, I do.

Q.  Is it fair to say that MMG then subcontracted out to Monaco Construction Corp. to do the actual excavation?

MR. GILIBERTI:  Objection.

A.  Yes.

Q.  Was there a problem in Monaco Construction Corp. doing the excavation?

MR. GILIBERTI:  Objection.

A.  I already said Monaco never did excavation.

Q.  Why did they not do excavation?

A.  Because they didn't have -- how you say it?  One second.  They did not agree enough between MMG Design and Monaco.

Q.  Is it fair to say some dispute arose between the sub, Monaco Construction Corp., and MMG Design, Inc. before Monaco Construction Corp. could begin their

51

Kanevsky

excavation work?

A.  Say it again, please.

Q.  The reason that Monaco Construction Corp. never performed any of the excavation work, was it because they got into some sort of dispute with MMG Design?

MR. GILIBERTI:  Objection.

MR. SCHOENE:  Are you aware of any dispute that occurred between MMG Design and Monaco?  Yes or no?

THE WITNESS:  I heard that Monaco didn't work for MMG Design anymore.  So, they left.

Q.  Do you know what the problem was?  What the dispute was?

A.  I don't know.

Q.  We'll move on.

After Monaco Construction Corp. was no longer employed by MMG Design, is that when you contracted with ATY Inc. to do excavation work?

A.  Yes.

Q.  Were you there on-site everyday that ATY did the excavation and the underpinning

52

Kanevsky

and the foundation work?

A.  Yes.

Q.  Did I get that right, that the first thing that ATY Inc. did was excavation of the site?

A.  No.

Q.  What's the first thing that ATY Inc. did for the project?

A.  It's a standard procedure. Underpinning.

Q.  Before they did the underpinning, did they have to excavate the ground adjacent to 97 Quentin Road?

A.  No.  They can't.

Q.  So, the very first thing that ATY Inc. did on the project was underpinning?

A.  Yes.

Q.  Did you observe the underpinning?

A.  Sure.

Q.  Tell me what you observed.  What did ATY Inc. do to underpin?

A.  It's a difficult question.

Q.  I will break it down for you.

Where did the ATY Inc. underpinning

53

Kanevsky

2 take place on the site? Could you point it
3 out on the diagram that you drew earlier?
4 A.    Sure.
5        MR. SCHOENE:  That's two
6 questions.  Are you withdrawing the
7 first question and asking him to point
8 it out on the diagram?
9        MR. NEWMAN:  Yes.
10 Q.    The question is, with respect to what
11 we've marked as Plaintiff's 2, where did ATY
12 Inc. perform underpinning?
13 A.    Right along here.
14 Q.    Could you just write the word
15 underpinning so we know?
16        Okay.
17        MR. SCHOENE:  Write it over here
18 too so there's no confusion.
19 Q.    What is underpinning?
20 A.    What is underpinning?  If you open the
21 drawings to get approval for this project,
22 you'll know exactly what underpinning is.
23 It's engineering terminology.
24 Q.    Let me ask you a question, sir.
25        What's your educational background?

54

Kanevsky

2 A.    I'm a civil engineer.
3 Q.    Are you a licensed --
4 A.    No.
5 Q.    Let me get the question out.
6        Are you a licensed civil engineer in
7 the United States?
8 A.    No.
9 Q.    What's the highest level of education
10 that you attained?
11 A.    Where?
12 Q.    Anywhere.
13 A.    Ukraine.  Bachelor's degree.
14 Q.    Bachelor's degree in what?
15 A.    Bachelor's degree in civil
16 engineering, and a Master's degree in roads
17 and bridges.
18 Q.    Where did you get your Bachelor's
19 degree, what institution in the Ukraine?
20 A.    By the way, it's not in the Ukraine.
21 It's Russia.  City is Voronge.
22 Q.    When did you get that degree?
23 A.    About 25 years ago.
24 Q.    What institution granted you your
25 Master's degree?

55

Kanevsky

2 A.    The same one.
3 Q.    What year?
4 A.    I don't remember the year.  About 25
5 years ago.
6 Q.    When did you come to the United
7 States?
8 A.    About 18 years ago.
9 Q.    Since coming to the United States did
10 you go to any educational institutions?
11 A.    No.
12 Q.    Do you have any professional licenses
13 in the United States of any type?
14 A.    Yes, I do.
15 Q.    What are they?
16 A.    New York City home improvement
17 license.
18 Q.    That's up to date?
19 A.    Yes.
20 Q.    Any other licenses in the United
21 States?
22 A.    Driver's license.
23 Q.    Any others?
24 A.    No.
25 Q.    So, you have a driver's license and a

56

Kanevsky

2 home improvement license?
3 A.    Yes.
4 Q.    Now, I want to go back, and I don't
5 want to look at the plans.  I just want you
6 as a person who was trained in Russia and has
7 degrees to explain to me what is
8 underpinning.  What is involved in doing
9 underpinning?
10 A.    Underpinning is a very, I would say,
11 complicated process.  To explain exactly
12 what's involved in this I'm going to need
13 much more time then we plan to spend here.
14 If you want, I'll continue.
15 Q.    Let me answer your question.  We have
16 literally days, if necessary, to spend here
17 for me to get the information that I need
18 from you.  So, I want you to spend as much
19 time as you need, take all the time that you
20 need, to explain to me exactly what
21 underpinning is.
22 A.    Not a problem.
23 Q.    Go ahead.
24 A.    Underpinning is a process to reinforce
25 and support the foundation of any existing

57

Kanevsky

2  building.  In order to be able to do the
3  excavation, the nearest property -- this
4  process involve partial -- okay -- partial
5  support in a certain type of existing
6  foundation.  This process moves along the
7  property as far as the previous part is done.
8  Each part usually takes two, three, four
9  days.  This process involves partial of
10  digging under the foundation, filling those
11  digging holes with reinforced concrete and
12  dry packing of the gap between existing
13  foundation and new underpinning.  That is
14  what underpinning means.
15  Q.     Did you observe all of what you just
16  described occur in the underpinning that was
17  performed adjacent to 97 Quentin Road?
18  A.     Yes.
19  Q.     Did you observe it literally everyday
20  that the underpinning was performed?
21  A.     Yes.
22  Q.     Did you take any pictures?
23  A.     Yes.
24  Q.     Where are those pictures?
25  A.     Oh, we have a lot of them.

58

Kanevsky

2  Q.     When you say a lot, do you have 10,
3  100, something in the middle?
4  A.     I would say more than 100.
5  Q.     Are they color or black and white?
6  A.     They're color.
7  Q.     Who took them?
8  A.     My workers, myself, Wonder Works.  The
9  owner's representative also.  We have a lot
10  of pictures.
11  Q.     Are the pictures dated?
12  A.     I believe most of them.
13  Q.     What kind of camera was used when you
14  took the pictures?  Was it a digital, SLR or
15  something else?
16  A.     Some was done by digital.  Some of the
17  pictures were done by Polaroids.
18  Q.     The pictures that you took or the
19  workers that you were working with took,
20  where are they now?  Where are they stored?
21  A.     Some of them are stored in Wonder
22  Works.  Some of them in my office.
23  Q.     When you say they're stored, are they
24  on the electronic flash chips or are they
25  actual color photographs of the underpinning?

59

Kanevsky

2  A.     Either way.  Some of them in the
3  computer.  Some of them on paper.
4  Q.     When you say paper, you mean actual
5  photographs?
6  A.     Sure.
7  Q.     Those are color photographs?
8  A.     Some of them.
9  Q.     About how many color photographs of
10  the underpinning do you possess?
11  A.     I don't remember.
12  Q.     The color photographs of the
13  underpinning that you possess, are those
14  taken from the beginning that the
15  underpinning was performed until the end that
16  the underpinning was performed; in other
17  words, showing the whole process?
18  A.     Yes.
19  Q.     Do any of those photographs show that
20  there is any problem or problems in doing the
21  process of creating the underpinning?
22  A.     Can you rephrase the question?
23  Q.     Yes, I will.  Let me say it a
24  different way.
25       In that you were on the job everyday

60

Kanevsky

2  were there any problems in the underpinning
3  being performed?
4  A.     I don't think so.
5  Q.     When you say you don't think so, does
6  that mean you're not sure or you know for a
7  fact that there were not any problems?
8  A.     I don't know what you mean by
9  problems.
10  Q.     I'll explain.
11       Did you observe any cracks that formed
12  that were created on the structure 97 Quentin
13  Road as a result of the underpinning being
14  done?
15  A.     No.
16  Q.     Were there any preexisting cracks on
17  the structure at 97 Quentin Road?
18  A.     Yes.
19  Q.     Where?
20  A.     All over.
21  Q.     Where?
22  A.     All over on the wall.
23  Q.     When you say the wall, are you
24  referring to the structure of 97 Quentin Road
25  above ground, below ground or something else?

61

Kanevsky

2  A.     If you're able to show me pictures --

3  Q.     I'll show you pictures later.

4  A.     Can you rephrase what you mean by

5  above ground or underground?

6  Q.     You want me to explain what the

7  difference is between above ground and

8  underground?

9  A.     Yes.

10  Q.     I will explain it to you.  Above grade

11  or below grade.

12  A.     You need to specify.

13  Q.     I'll do my best so you can understand

14  exactly what I'm asking for.  Let's do it

15  this way.

16     Prior to any excavation beginning,

17  prior to demolition, did you notice any

18  cracks on the outside of 97 Quentin Road?

19  A.     Yes.

20  Q.     Where were they?

21  A.     Along this wall.  All along the wall.

22  All over.

23  Q.     So, I want you to diagram, if you

24  don't mind, cracks that you saw on the

25  exterior of 97 Quentin Road prior to

62

Kanevsky

2  demolition beginning.

3  A.     You asked me a previous question

4  before demolition and excavation.  I answered

5  yes, I do.  I saw the cracks.  Now you're

6  asking for prior to demolition.  No one is

7  able to see anything prior to demolition.

8  Q.     That's because there was a structure

9  next to both walls of 97 Quentin Road; is

10  that right?

11  A.     That's correct.

12  Q.     So, you couldn't see any cracks on the

13  exterior of the two walls that eventually

14  were exposed because there were buildings

15  adjacent; is that correct?

16  A.     That's correct.

17  Q.     What I'm asking is, on the two walls

18  of 97 Quentin where there were not structures

19  adjacent to it, did you notice prior to

20  demolition if there were any cracks on the

21  exterior of those walls?

22  A.     On those walls?

23  Q.     Yes.

24  A.     Those walls had pointing on the brick

25  veneer.  So, even now if you look at that

63

Kanevsky

2  brick veneer, you'll see the previous cracks.

3  Q.     Okay.

4  A.     Even if they were filled with the

5  pointing material, even now you're able to

6  see all previous cracks which used to be

7  fixed by pointing.

8  Q.     Okay.  So, let's do it this way.

9     Prior to demolition did you inspect 97

10  Quentin Road?

11     MR. SCHOENE:  When you say

12     inspect, I'd like to know what you

13     mean by that.  Do you mean just look

14     at casually, or how do you use the

15     word inspect?

16  Q.     Prior to the demolition did you walk

17  around the perimeter of 97 Quentin Road and

18  inspect the exterior of the building located

19  at 97 Quentin Road?

20  A.     Yes, I do.  This is standard

21  procedure, to look at all the properties

22  around.

23  Q.     When did you do that?

24  A.     When?

25  Q.     Yes.

64

Kanevsky

2  A.     Daily basis.

3  Q.     No.

4     The question was, when was the first

5  time prior to demolition that you walked

6  around 97 Quentin Road and inspected the

7  exterior of 97 Quentin Road?  Prior to

8  demolition when is the first time you did

9  that?

10  A.     I would say in the first few days when

11  the demolition starts.  It means when the

12  demolition permit already exists, but the

13  actual work was not done yet.

14  Q.     That's the first time you inspected,

15  looked at the facade of 97 Quentin Road?

16  A.     Yes.

17  Q.     Did you take any photographs in that

18  first inspection?

19  A.     On that one, not me, but Wonder Works

20  did.  I would be able to pull those

21  photographs.  They exist.

22  Q.     When you were inspecting the exterior

23  of 97 Quentin Road for the first time, was

24  there a representative from Wonder Works that

25  inspected the outside of 97 Quentin Road as

57

Kanevsky

building.  In order to be able to do the
excavation, the nearest property -- this
process involve partial -- okay -- partial
support in a certain type of existing
foundation.  This process moves along the
property as far as the previous part is done.
Each part usually takes two, three, four
days.  This process involves partial of
digging under the foundation, filling those
digging holes with reinforced concrete and
dry packing of the gap between existing
foundation and new underpinning.  That is
what underpinning means.

Q.    Did you observe all of what you just
described occur in the underpinning that was
performed adjacent to 97 Quentin Road?

A.    Yes.

Q.    Did you observe it literally everyday
that the underpinning was performed?

A.    Yes.

Q.    Did you take any pictures?

A.    Yes.

Q.    Where are those pictures?

A.    Oh, we have a lot of them.

58

Kanevsky

Q.    When you say a lot, do you have 10,
100, something in the middle?

A.    I would say more than 100.

Q.    Are they color or black and white?

A.    They're color.

Q.    Who took them?

A.    My workers, myself, Wonder Works.  The
owner's representative also.  We have a lot
of pictures.

Q.    Are the pictures dated?

A.    I believe most of them.

Q.    What kind of camera was used when you
took the pictures?  Was it a digital, SLR or
something else?

A.    Some was done by digital.  Some of the
pictures were done by Polaroids.

Q.    The pictures that you took or the
workers that you were working with took,
where are they now?  Where are they stored?

A.    Some of them are stored in Wonder
Works.  Some of them in my office.

Q.    When you say they're stored, are they
on the electronic flash chips or are they
actual color photographs of the underpinning?

59

Kanevsky

A.    Either way.  Some of them in the
computer.  Some of them on paper.

Q.    When you say paper, you mean actual
photographs?

A.    Sure.

Q.    Those are color photographs?

A.    Some of them.

Q.    About how many color photographs of
the underpinning do you possess?

A.    I don't remember.

Q.    The color photographs of the
underpinning that you possess, are those
taken from the beginning that the
underpinning was performed until the end that
the underpinning was performed; in other
words, showing the whole process?

A.    Yes.

Q.    Do any of those photographs show that
there is any problem or problems in doing the
process of creating the underpinning?

A.    Can you rephrase the question?

Q.    Yes, I will.  Let me say it a
different way.

In that you were on the job everyday

60

Kanevsky

were there any problems in the underpinning
being performed?

A.    I don't think so.

Q.    When you say you don't think so, does
that mean you're not sure or you know for a
fact that there were not any problems?

A.    I don't know what you mean by
problems.

Q.    I'll explain.

Did you observe any cracks that formed
that were created on the structure 97 Quentin
Road as a result of the underpinning being
done?

A.    No.

Q.    Were there any preexisting cracks on
the structure at 97 Quentin Road?

A.    Yes.

Q.    Where?

A.    All over.

Q.    Where?

A.    All over on the wall.

Q.    When you say the wall, are you
referring to the structure of 97 Quentin Road
above ground, below ground or something else?

Kanevsky

1
2  A.    If you're able to show me pictures --
3  Q.    I'll show you pictures later.
4  A.    Can you rephrase what you mean by
5  above ground or underground?
6  Q.    You want me to explain what the
7  difference is between above ground and
8  underground?
9  A.    Yes.
10 Q.    I will explain it to you.  Above grade
11 or below grade.
12 A.    You need to specify.
13 Q.    I'll do my best so you can understand
14 exactly what I'm asking for.  Let's do it
15 this way.
16       Prior to any excavation beginning,
17 prior to demolition, did you notice any
18 cracks on the outside of 97 Quentin Road?
19 A.    Yes.
20 Q.    Where were they?
21 A.    Along this wall.  All along the wall.
22 All over.
23 Q.    So, I want you to diagram, if you
24 don't mind, cracks that you saw on the
25 exterior of 97 Quentin Road prior to

62

Kanevsky

1
2  demolition beginning.
3  A.    You asked me a previous question
4  before demolition and excavation.  I answered
5  yes, I do.  I saw the cracks.  Now you're
6  asking for prior to demolition.  No one is
7  able to see anything prior to demolition.
8  Q.    That's because there was a structure
9  next to both walls of 97 Quentin Road; is
10 that right?
11 A.    That's correct.
12 Q.    So, you couldn't see any cracks on the
13 exterior of the two walls that eventually
14 were exposed because there were buildings
15 adjacent; is that correct?
16 A.    That's correct.
17 Q.    What I'm asking is, on the two walls
18 of 97 Quentin where there were not structures
19 adjacent to it, did you notice prior to
20 demolition if there were any cracks on the
21 exterior of those walls?
22 A.    On those walls?
23 Q.    Yes.
24 A.    Those walls had pointing on the brick
25 veneer.  So, even now if you look at that

63

Kanevsky

1
2  brick veneer, you'll see the previous cracks.
3  Q.    Okay.
4  A.    Even if they were filled with the
5  pointing material, even now you're able to
6  see all previous cracks which used to be
7  fixed by pointing.
8  Q.    Okay.  So, let's do it this way.
9        Prior to demolition did you inspect 97
10 Quentin Road?
11       MR. SCHOENE:  When you say
12       inspect, I'd like to know what you
13       mean by that.  Do you mean just look
14       at casually, or how do you use the
15       word inspect?
16 Q.    Prior to the demolition did you walk
17 around the perimeter of 97 Quentin Road and
18 inspect the exterior of the building located
19 at 97 Quentin Road?
20 A.    Yes, I do.  This is standard
21 procedure, to look at all the properties
22 around.
23 Q.    When did you do that?
24 A.    When?
25 Q.    Yes.

64

Kanevsky

1
2  A.    Daily basis.
3  Q.    No.
4        The question was, when was the first
5  time prior to demolition that you walked
6  around 97 Quentin Road and inspected the
7  exterior of 97 Quentin Road?  Prior to
8  demolition when is the first time you did
9  that?
10 A.    I would say in the first few days when
11 the demolition starts.  It means when the
12 demolition permit already exists, but the
13 actual work was not done yet.
14 Q.    That's the first time you inspected,
15 looked at the facade of 97 Quentin Road?
16 A.    Yes.
17 Q.    Did you take any photographs in that
18 first inspection?
19 A.    On that one, not me, but Wonder Works
20 did.  I would be able to pull those
21 photographs.  They exist.
22 Q.    When you were inspecting the exterior
23 of 97 Quentin Road for the first time, was
24 there a representative from Wonder Works that
25 inspected the outside of 97 Quentin Road as

65

Kanevsky

well?

MR. SMAR> Objection.

Q.    Was there anyone with you when you inspected 97 Quentin Road for the first time?

A.    I don't remember, but one of the representatives of Wonder Works was there. So, we inspected on a daily basis.

Q.    I'm not asking you about on a daily basis. I'm asking you about the first time you inspected --

A.    I don't remember, sir.

Q.    Let me get the question out.

The first time you inspected 97 Quentin Road did you inspect the interior of the building 97 Quentin Road?

A.    Only whatever was visible.

Q.    Let me be clear.

Sir, were you dealing with anyone in particular on a regular basis who was employed by Wonder Works when overseeing the project?

A.    Yes, I do.

Q.    Who were you dealing with at Wonder Works?

66

Kanevsky

A.    During this project a few people was on this job from Wonder Works.

Q.    Who were they?

A.    In the beginning it was Gabriel.

Q.    I'm going to interrupt you.

Is Gabriel a first name or second name?

A.    First name.

Q.    Do you remember the second name?

MR. SMAR:  Off the record.

(Discussion held off the record.)

A.    Cozen.

Q.    What did Gabriel Cozen do?

A.    Owner's representative.  He's like a double check.

Q.    Who else?

A.    Jeff Koifman.

Q.    His role, was it different from the other gentleman from Wonder Works?  Was Jeff functioning as an owner's rep, a double check as to what was going on?

A.    Yes.

Q.    Did he do anything else other than act

67

Kanevsky

as an owner's rep to oversee the construction?

A.    He also oversee the construction.

Q.    Did he do anything other than oversee the construction?

A.    I don't know what you mean by other.

Q.    Aside from supervising and overseeing the construction, did he have any other role on the project?  Did he do anything else professionally?

A.    For example?

Q.    I don't know.  I'm asking you.

Did he do the construction?

A.    Did he do the construction?

Q.    Yes.

A.    No.

Q.    Any other representatives from Wonder Works that you interacted with?

A.    Yes.  Later on it was Anthony Galu.

Q.    What did Anthony Galu do?  Same thing?

A.    Same thing.

Q.    Anybody else from Wonder Works?

A.    I would say no.

Q.    You said you had the same role as

68

Kanevsky

these fellows from Wonder Works, owner's rep. Is that what your role was?  Were you project engineer?  What was your title at the project?  I'm still not clear.

MR. SCHOENE:  Objection to form.

You can answer, if you can.

Q.    What was your title on the project?

MR. SCHOENE:  Note my objection.

A.    I don't understand what you mean by this question.

Q.    Did you have an official title?  What was your role in --

MR. SCHOENE:  That's two questions.

MR. NEWMAN:  I'll do it this way.

Q.    Did you have any title designation in overseeing the work of the construction adjacent to 97 Quentin Road?

A.    I don't understand the question.

Q.    Were you called the construction manager for the project?

A.    I'm the vice-president of the company who does actual work on this particular job

Kanevsky

1
2  site.
3  Q.    In doing the work was there any title
4  that was given to you?  If somebody said I
5  want to see the construction manager, would
6  that be you?  Did you have a title?
7  A.    I have to do everything.
8  Q.    I'm just asking.  If the answer is no,
9  the answer is no.  No problem.
10 A.    Okay.
11 Q.    Is it fair to say you supervised the
12 underpinning?
13 A.    Yes.
14 Q.    Did you supervise the excavation?
15 A.    Yes.
16 Q.    Did you supervise the construction of
17 the foundation?
18 A.    Yes.
19 Q.    You testified earlier in describing
20 underpinning that one of the components of
21 the underpinning is dry packing.
22 A.    Yes.
23 Q.    Describe to me what dry packing is.
24 A.    Dry packing is a material which is not
25 as a regular concrete shrinks.  So, after the

---

Kanevsky

2  concrete is poured in the hole in the ground
3  and shrinks, the dry pack fills the gap
4  between new concrete, which is underpinning,
5  and the old building foundation in order to
6  properly support it.
7  Q.    Typically what is dry packing made of?
8  What is the material used to do dry packing?
9  A.    There's a special nonshrink grout used
10 for dry packing.
11 Q.    Did you observe the dry packing that
12 was performed for the project?
13        Again, when I'm saying project, just
14 so we all know, it's the project adjacent to
15 97 Quentin Road.
16 A.    Yes, I do.
17 Q.    Were there any problems that you
18 observed with the application of the dry
19 packing?
20 A.    No.
21 Q.    Did you take photographs of the dry
22 packing?
23 A.    Yes.
24 Q.    Do you have those photographs in your
25 office?

---

Kanevsky

1
2  A.    Yes, and here too.
3  Q.    Here too?  Okay.
4        The photographs, did you bring them
5  with you?
6  A.    No.  He have them.
7        MR. SCHOENE:  I have them.  I
8        exchanged them.
9  Q.    Are those photographs dated of the dry
10 packing?
11 A.    I don't remember.
12 Q.    Were there any problems that you saw
13 of any type in doing the underpinning, in the
14 underpinning being performed in the project
15 adjacent to 97 Quentin Road, and when you
16 were observing it everyday, did you ever
17 observe any problems whatsoever in the
18 construction of the underpinning?
19        MR. SCHOENE:  Objection.  You
20        already asked if there was a problem
21        with the application, and I think he
22        said no.  Is this somehow different?
23        MR. NEWMAN:  I will move on.
24 Q.    Were there any problems that you
25 observed with regard to ATY Inc. performing

---

Kanevsky

1
2  its work?  In other words, did everything go
3  exactly as it was supposed to when observing
4  the work performed by ATY Inc.?
5  A.    My job is to catch the problem before
6  it becomes dangerous.  If there's no problems
7  on the job, nobody is going to need me.
8  Definitely I see the problem everyday, and I
9  fix it before it needs to be fixed.
10 Q.    So, you did see problems?
11 A.    Correct.
12 Q.    Tell me about the problems that you
13 fixed when it came to the underpinning.
14 A.    The problems?
15 Q.    Yes.
16 A.    Tons of them.
17 Q.    Tons of them?
18 A.    Tons of them.
19 Q.    What were they?  Tell me.
20 A.    For example, one day I get a delivery
21 of the dry pack, and the delivery was loaded
22 from the supplier in the rain.  It was bad
23 weather.  I didn't accept it.
24 Q.    So, if I understand what you're
25 saying, because you observed it you prevented

Kanevsky

2 a problem with the dry pack.

3       I want you to tell me every problem
4 that you observed that you solved before it
5 became a problem or bigger problem, and I'm
6 just limiting it to underpinning.

7   A.    It's so many years ago. How could I
8 remember? For me it's not a problem. It's
9 just my work to prevent a problem. How
10 should I remember all the small stuff?

11   Q.    All I'm asking you to do is follow my
12 instructions that I gave you in the beginning
13 of this line of questioning, which is if you
14 don't remember something, just tell us you
15 don't remember. That's fine.

16       You just testified that you remember
17 that when it came to underpinning, there was
18 a potential problem in getting faulty dry
19 pack material. If you recall, were there any
20 other problems that you observed when it came
21 to underpinning?

22   A.    I'll say there were no major problems
23 that I should remember at that site.
24 Everything was finally done correctly.

25   Q.    When you say finally done correctly,

---

Kanevsky

2 were there things that you had to correct
3 when it came to underpinning?

4   A.    Tons of things.

5   Q.    Tell me the things you had to correct.
6 Tell me.

7   A.    I don't remember the small stuff. I
8 told you there were no major problems.

9   Q.    You said you had to correct
10 everything, to use your words a second ago.
11 Tell me what you had to correct when it came
12 to underpinning.

13   A.    There's a standard procedure to do any
14 work, and any workers, subcontractors or
15 others, do not always know by the book how
16 it's supposed to be done, and my job is to
17 correct them. If they use the wrong shovel
18 to dig the ground, I have to make sure this
19 is the right shovel. If they have to use the
20 plywood to support something with the wood, I
21 have to see if this is the right size of the
22 wood and they do the right things deep enough
23 to perform the job. So, my job is to correct
24 every problem at every second on the job. No
25 major ones for me.

---

Kanevsky

2   Q.    When you say no major ones for me --

3   A.    No major problems on the job for me.

4   Q.    I understand you just described for me
5 what your role was on the job.

6       Besides for the one thing that you
7 pointed out for me, that there was a bad
8 delivery of not proper quality dry pack --

9   A.    I didn't say not proper quality.

10   Q.    Dry pack that was affected by the
11 rain.

12   A.    I didn't say that.

13   Q.    What did you say, sir?

14   A.    I said the dry pack was loaded under
15 the rain, and I didn't take a chance to check
16 if it was good or bad. I simply replaced it.

17   Q.    I'm glad you're being precise, because
18 sometimes I'm not as precise as I'd like to
19 be.

20       If you can't remember, just tell me
21 you can't remember and we'll move on.

22       Were there any other issues, problems
23 that you recall having to do with the
24 construction of the underpinning?

25   A.    We probably have different

---

Kanevsky

2 understandings of the word problem.

3   Q.    Do you want me to define problem for
4 you?

5   A.    Yes.

6   Q.    Problem would be when you in your role
7 as the supervisor of the underpinning saw
8 something about to be done in the
9 construction of the underpinning which was
10 not appropriate or proper from your
11 perspective as the guy who is overseeing the
12 underpinning. That's what I mean.

13   A.    Okay. I understand your question.

14   Q.    Good.

15   A.    I would say I had the chance to
16 prevent any problems before they even
17 started.

18   Q.    I understand what you're saying.

19   A.    So, there is no problem done on the
20 job. Nobody did a mistake.

21   Q.    Nobody did a mistake?

22   A.    Nobody.

23   Q.    Let me ask you this.

24       So, the job went perfectly in all
25 aspects from the demolition to the

77

Kanevsky

1
2  construction? Everything was perfect?
3  A.    The building is perfect. It's still .
4  standing. It did not come down.
5  Q.    From when the job first began -- we'll
6  go back to the underpinning in a moment --
7  how long was it to take from the demolition
8  to the completion of the building? How long
9  was that?
10  A.    Four years.
11  Q.    Four years?
12  A.    About.
13  Q.    In your educational background and
14  your experience working as a construction
15  manager in the United States, is that a
16  normal amount of time to build a building the
17  size of the building adjacent to 97 Quentin
18  Road?
19  A.    There is no standard on it.
20  Q.    Are there documents that show that the
21  plan was to take four years to construct the
22  building?
23  A.    The plans don't show any dates.
24  Q.    Were there any delays encountered at
25  anytime in constructing this building?

78

Kanevsky

2  A.    The speed of the construction depends
3  on the construction site only for one thing,
4  money, financing. That's all.
5  Q.    Was there an issue with financing on
6  this project?
7  A.    There is no issue. I'm not going to
8  discuss any financial issues. No way, no
9  how.
10  Q.    Let me see if I'm understanding your
11  testimony. Your testimony is that you refuse
12  to discuss any financing on this property; is
13  that correct?
14  A.    I'm here to discuss the construction,
15  not the financing.
16  Q.    So, you're defining the types of
17  questions and the areas I can go into; is
18  that correct, sir?
19         MR. SCHOENE:  Objection.
20  Q.    Are there other areas that I cannot
21  ask you about?
22  A.    My privacy, and my financial stuff is
23  privacy.
24  Q.    I want to know what my limits are in
25  asking you questions at this deposition, sir.

79

Kanevsky

2  We'll move on, sir.
3  There were, no, delays in building this
4  building; is that fair to say?
5  A.    I would say this building was built by
6  the schedule related and based on that
7  financing, and other engineering,
8  architectural questions, there is no delay on
9  the building because I have no engineering or
10  construction problem.
11  Q.    My question is, was this building
12  delayed in its construction in anyway?
13  A.    I don't understand your question.
14  Q.    Let me rephrase it.
15  At the beginning of this project you
16  were the construction manager right from the
17  beginning?
18  A.    Yes.
19  Q.    Is it fair to say that in your mind as
20  the construction manager it was planned to
21  take four years to construct this building?
22  A.    No.
23  Q.    How long was it to take in your mind
24  to construct this building?
25  A.    Two to three years.

80

Kanevsky

2  Q.    Is the building completed?
3  A.    Yes.
4  Q.    How long did it take to complete the
5  building?
6  A.    Four years.
7  Q.    What was the reason it took four
8  years?
9  A.    My mistake in calculating the time.
10  Q.    Your calculation was wrong?
11  A.    My calculation was wrong.
12  Q.    It's not because there were any
13  problems of any type in building this
14  building, but you simply didn't calculate
15  that the normal construction rate would be
16  four years; is that fair to say?
17  A.    Ask me again, please.
18  Q.    It seems to me that you're saying to
19  me that the problem here was not in building
20  the building, but the problem was that you as
21  the construction manager miscalculated how
22  long it would take, meaning you thought it
23  should have taken three years, but you simply
24  miscalculated, and it should have taken four
25  years; is that fair to say?

Kanevsky

1

2   A.    Yes.

3   Q.    Sir, let me ask you this.

4        Were any underground water or streams

5   found on-site?

6   A.    Yes.

7   Q.    When was the first time that water was

8   found on-site?

9   A.    When we actually dig and we reach the

10  water.

11  Q.    When did that happen?

12  A.    I believe it was the end of 2004 or

13  beginning of 2005.  Something like that.

14  Q.    What entity was doing the actual

15  excavation of the dirt?

16  A.    What entity? ATY.

17  Q.    ATY?  Okay.

18       What happened?  Was it a matter of

19  just digging dirt and water just started to

20  appear?

21  A.    Yes.

22  Q.    Did you see the water?

23  A.    Yes.

24  Q.    Where was the water coming from?

25  A.    Just underground water.

---

Kanevsky

1

2   Q.    Was it a lot of water or small amount

3   of water or something in the middle?

4   A.    I don't know what you mean by small

5   amount or high amount.

6   Q.    A large amount of water would be like

7   a stream or a river.  Was it something like

8   that?

9   A.    It's underground.  I can't see it.

10  Q.    Oh, it was underground?

11  A.    It was still underground.

12  Q.    How did you know you hit water?

13  A.    I see a little bit of the water.

14  Q.    So, in other words, excavation was

15  going and some water started to appear on top

16  of the excavation?

17  A.    Yes.

18  Q.    Was it a small amount of water?

19  A.    What we're able to see when it

20  appears, it was a small amount of water

21  because we didn't dig deep.  We didn't have

22  the chance to dig deep on that one.

23  Q.    Did the appearance of the water create

24  any problems in doing the excavation?

25  A.    Oh, sure.

---

Kanevsky

1

2   Q.    What were the problems?

3   A.    We had to stop doing excavation.

4   Q.    Why?

5   A.    Because nobody do the excavation

6   underwater.

7   Q.    How long was the excavation stopped?

8   A.    I wouldn't say we stopped excavation

9   completely.  We stopped excavating lower than

10  the water level.  We still continued to do

11  the excavation.

12  Q.    Once you saw the water did there come

13  a time subsequent to that, after that, where

14  you had to excavate lower?

15  A.    Lower than what?

16  Q.    Lower than the level where it wasn't a

17  problem to excavate knowing that there was

18  water beneath.

19  A.    We never excavate underwater.

20  Q.    So, is it fair to say that once you

21  saw the water that was the lowest level that

22  you excavated?

23  A.    No.  I didn't say so.

24  Q.    Once you saw the water did that cause

25  any delays in the excavation?

---

Kanevsky

1

2   A.    It didn't cause delay in excavation.

3   Q.    No delays at all?

4   A.    No delay in excavation.

5   Q.    No delay in excavation?

6   A.    No.

7   Q.    How did you deal with the fact from an

8   excavation standpoint now that you knew that

9   there was underground water?  What did you do

10  about that?

11  A.    I simply called the engineer, and he

12  was waiting for the new part, the additional

13  part of the project.

14  Q.    The new part, additional part of the

15  project, what does that mean?  A new plan for

16  excavation?

17  A.    Yes, and underpinning and shoring used

18  to be part of those plans.

19  Q.    I'm confused, but I have been confused

20  a large part of my life.  So, let's do it

21  this way.

22       Could you do a cross sectional looking

23  that way instead of from above diagram of

24  where -- not where.  Once the water

25  appeared -- maybe you can just do it in

45

Kanevsky

testimony. Once the water appeared did you
excavate below that level of the ground?

A.    Yes.

Q.    How much time was it between the time
you first saw the water until the time you
excavated below that level where the water
appeared?  How much time passed?

A.    Six months. Maybe eight months.
Something like that.

Q.    Why was there that delay of six to
eight months before you started excavating
below where the water appeared?

A.    We were waiting for the change of
plan.

Q.    Was there a change of plan that needed
to be drafted by a professional engineer to
deal with the fact that there was water?

A.    Sure.

Q.    Maybe you didn't understand before.
That's what I was asking you.
Describe to me what the change was.
What had to be done by the PE to take into
account that there was underground water?

A.    We used to have an elevator pit. We

46

Kanevsky

used to have one elevator in the building in
the original project. The elevator pit from
that elevator used to be under the water.
So, the change was planned. Now we have in
the building two elevators. One goes from
the first floor up, another one to the
basement, to the first floor. So, the change
to the plan was do not dig lower.

Q.    Lower?

A.    Lower than it used to be on the first
one.
The change to the plan was we added a
second elevator in order to avoid digging
deeper, and we were waiting for those
changes.

Q.    Any other changes that came about
along the similar lines of what you just
described? In other words, because of water
that was found, were there any other changes
put in place aside from the additional
elevator?

A.    It's not only elevator. These changes
involved change of a layout of the first
floor, change of a layout of the basement,

47

Kanevsky

foundation, grade beams. A lot of different
changes.

Q.    How was the foundation changed as a
result of finding water?

A.    Just configuration of the grade beams.
They just lay in different places.

Q.    Why did that have to be changed? Was
it to avoid the water?

A.    No. To accommodate the new layout.

Q.    The new layout was based upon the fact
that there was water underground?

A.    The new layout was based on the fact
that in order to avoid digging underwater we
had to eliminate elevator pit and build the
second one.

Q.    Is it fair to say that once you found
the water that the depth of excavation that
was originally planned was changed so that
you did not dig as ultimately planned?

A.    Say again, please.

Q.    Once the water was found was one of
the big changes that were made that the
professional engineer determined that the
building could be constructed where you

48

Kanevsky

didn't have to excavate the dirt as deep as
originally planned?

A.    Yes.

Q.    Do you recall or do you know how deep
the excavation below grade was originally
suppose to be? Is that the right way to
think of it?

A.    The only change is the digging for the
elevator pit, which was eliminated from the
project. The rest of the project stayed the
same.

Q.    Stayed the same as far as how deep the
excavation would go?

A.    Yes.

Q.    Do you recall how deep the excavation
was planned to go below grade?

A.    I don't remember the number. What we
have right now is what was originally dug.

Q.    If we looked at the plans, we would
find that out?

A.    Yes.

Q.    Being the one who was making sure no
problems arose with the underpinning, did you
ever have to intervene with regard to any

Kanevsky

```
 1                   Kanevsky
 2   other aspect of the underpinning?  You
 3   mentioned the dry pack.  Were there any other
 4   problems that you ever encountered, that you
 5   saw that you had to intervene to prevent a
 6   major problem with the underpinning?
 7   A.    No.
 8   Q.    I'll ask you the same question with
 9   regard to the foundation work.
10         Were there any major issues that came
11   up while you were overseeing the foundation
12   work that you had to intervene to prevent the
13   construction foundation from turning into a
14   major problem?
15   A.    Yes, this.
16   Q.    You are pointing to Plaintiff's
17   Exhibit 2, and say what you were about to
18   say.
19   A.    That was the problem.
20   Q.    When you say that was the problem,
21   you're referring to what you testified to
22   earlier when there was an existing foundation
23   and you changed the plans?
24   A.    Yes.
25   Q.    Anything else with regard to the
```

Kanevsky

```
 1   construction of the foundation of the
 2   building adjacent to 97 Quentin Road where
 3   you had to intervene before the construction
 4   of the foundation turned into a major
 5   problem?
 6   A.    Nothing major.
 7   Q.    Anything with regard to the
 8   excavation, aside from what you testified to,
 9   where you had to intervene before the
10   excavation turned into a major problem?
11   A.    Excuse me?
12   Q.    When the excavation was going on, when
13   they were digging out the dirt, did you see
14   anything as the guy who was there on the job
15   everyday that could have been turned into a
16   major problem but for you intervening and you
17   saying you're doing it wrong, did anything
18   come up?
19   A.    No, nothing major.
20   Q.    Were there any violations issued on
21   this job by the New York City Department of
22   Buildings?
23   A.    Yes.
24   Q.    How many?
```

Kanevsky

```
 1                   Kanevsky
 2   A.    I don't remember.
 3   Q.    Did you have to make any court
 4   appearances with regard to the violations?
 5   A.    Not me.
 6   Q.    Who did, if anyone?
 7   A.    I'm not sure if there was any, but if
 8   so, my expediter.
 9   Q.    Who was your expediter?
10   A.    At different times we have different
11   people, but I'm not sure on this job who it
12   was.
13   Q.    Let me ask you that question.
14         Did you employ any expediters to do
15   any work on the project?
16   A.    I think so.  Yes.
17   Q.    Who did you employ?
18   A.    The name?
19   Q.    Yes.
20   A.    Colleen Morris.
21   Q.    M-O-R-R-I-S?
22   A.    I'm not sure.
23   Q.    Is that a person or entity?
24   A.    I believe it's a person.
25   Q.    What's the location of Colleen Morris?
```

Kanevsky

```
 1                   Kanevsky
 2   A.    She'll go to any borough.
 3   Q.    Where is her office?  Where is she
 4   based?
 5   A.    I believe she works from the home
 6   office.
 7   Q.    The home office?
 8   A.    Yes.
 9   Q.    Your home office?
10   A.    Her home.
11   Q.    She worked out of her home?
12   A.    Yes.
13   Q.    Did you employ any other expediters
14   aside from her?
15   A.    I don't remember.  I don't think so.
16   Q.    Do you know if the Department of
17   Buildings or the Environmental Protection
18   Board ever found that the violations that
19   were issued were in fact correctly issued; in
20   other words, that there were legitimate
21   violations?  Do you know?
22   A.    I would say any of those violations
23   mean to me the same as a parking ticket.
24   Nothing major.
25         MR. NEWMAN:  I move to strike
```

93

Kanevsky

the answer as not responsive.

Q.    Let me ask it again.

You testified that there were
violations that were issued, and I'm asking
you do you know if the Department of
Buildings or the Environmental Protection
Board ever found at a hearing that those
violations were legitimate?

A.    I don't recall any particular
violations.  So, I would say no.

Q.    Now, did you ever get the chance to
inspect prior to demolition adjacent to 97
Quentin Road the interior of 97 Quentin Road?

A.    No.

Q.    Did you ever inspect the interior of
97 Quentin Road?

A.    Yes.

Q.    When?

A.    Probably 2006 or late 2005.  Something
like that.

Q.    Did you inspect the interior of 97
Quentin Road alone or with somebody else?

A.    With somebody else.

Q.    Who else?

---

94

Kanevsky

A.    I believe the person was a super at
that building.

Q.    How did you get entry to 97 Quentin
Road in the time that you're describing?

A.    He invited me.

Q.    Did you get in contact with him, or
how did you get to know who the super was?

A.    He simply catch me on the job site and
asked me to take a look at something.

Q.    So, the super approached you?

A.    Yes.

Q.    The super of 97 Quentin Road
approached you and asked you to look at
something.  What did he say to you when he
approached you at the job site?

A.    He brought me to the basement.  So, I
had a chance to look at the basement, but the
super at that time used to work as a finish
guy on doors.  He used to paint the doors,
and he had showed me his job and he offered
me his help.  He asked me to do the job on
the project.

Q.    He approached you on the job site, the
super for 97 Quentin Road, because he was

---

95

Kanevsky

looking for work?

A.    Yes.

Q.    Did you offer him work?

A.    I told him when the time came, why
not.

Q.    Besides for that, besides for the
super asking you for work, did he ask you to
come and look inside 97 Quentin Road or did
you initiate that inspection?

A.    Ask me again.

Q.    The first time you met the super at 97
Quentin Road you said he met you on the job
site and asked you basically for work; is
that correct?

A.    Yes.

Q.    Did something else happen in that
initial interaction between you and the super
that led you to inspect the interior of 97
Quentin Road?

A.    Yes.  I found that through the
foundation wall you can see outside through
the cracks, and I asked him what kind of
crack is that?  How long is that crack there?

Q.    I appreciate what you're saying, and I

---

96

Kanevsky

read that in documents, but I'm asking a
different question.

I'm simply asking you, you had this
initial meeting.  At the first meeting with
this guy -- what was the super's name?  Do
you recall?

A.    I don't recall.

Q.    What did he look like?

A.    Old guy.

Q.    Tall or short?

A.    Not tall.  Not short.

Q.    Medium size?

A.    Medium size.

Q.    5'6, 5'8?

A.    Probably.

Q.    Fat or skinny?

A.    He's not fat definitely.

Q.    Skinny man?

A.    I would say so.

Q.    Was he white, black, Hispanic or
something else?

A.    White.  I would say white.

Q.    I'm trying to reconstruct this.  He
said hey, I do this kind of work.  Can you

97

Kanevsky

1 give me work, and then after that, did he say
2 anything else to you?
3 A.    We met afterwards.
4 Q.    I'm not saying did you meet
5 afterwards.
6        In that initial meeting did you say
7 anything to him or did he say anything to you
8 after that initial discussion of he, the
9 super, getting work on the job? Was anything
10 else discussed?
11 A.    No.  We have a simple meeting.  We
12 just spoke about anything.  Anything.
13 Q.    Let me ask it a different way.
14        You just testified that he, the super,
15 approached you and said can I get some work
16 on the job.  Did you and him discuss anything
17 else other than his desire for employment in
18 that initial meeting with the super?
19 A.    Yes.
20 Q.    What did you speak about?
21 A.    I tried to explain.  I stay in the
22 basement, and while we had the conversation
23 right next to me through the wall, foundation
24 wall, I saw the outside air, the bright

98

Kanevsky

1 light, and I ask him what kind of crack is
2 that?  How long has that crack been there?
3 He told me that he found out that there is
4 sun since we do the demolition.  Prior to
5 demolition probably the crack was closed by
6 the other structure.
7 Q.    Here's my question.  I'm simply trying
8 to find out how it came about that you got to
9 be in the interior of 97 Quentin Road.  Did
10 you ask to be in the inside of the building,
11 did the super invite you or something else?
12        MR. SCHOENE:  Note my objection.
13 That makes it sound like he was not
14 responsive to the previous question,
15 which he was.
16        MR. NEWMAN:  I will rephrase it.
17 Q.    Sir, how did it come to be that you
18 ended up in the interior of 97 Quentin Road?
19 Were you invited in or did you ask to come
20 in?
21 A.    I'm standing right outside of the
22 property doing my work.  This guy simply
23 stops his truck with the doors, and I asked
24 him what are you doing with those doors?  He

99

Kanevsky

1 explained to me he's doing the finishing.
2 So, he invites me.
3 Q.    He invited you to come into the
4 building?
5 A.    Come look at his work.
6 Q.    Was his work in the interior of the
7 building?
8 A.    Yes.  His shop was in the basement.
9 Q.    That's how you got to the basement?
10 A.    Absolutely.
11 Q.    Did you look at the doors that he
12 worked on?
13 A.    Yes.
14 Q.    Once you were looking at the doors you
15 saw a crack?
16 A.    Yes.
17 Q.    Where did you see that crack in the
18 basement?
19 A.    Here.
20        MR. NEWMAN:  The witness is
21 indicated --
22 A.    There's a lot of cracks over there
23 like this, but that particular one, I believe
24 it was approximately here.

100

Kanevsky

1        MR. NEWMAN:  The witness is
2 pointing to the middle of the longer
3 wall on Plaintiff's Exhibit 2.
4        MR. SCHOENE:  His finger was
5 going back and forth to show that he
6 didn't know exactly where it was.
7        MR. NEWMAN:  Let the record
8 reflect that the finger was going
9 along the full length of the longest
10 wall of 97 Quentin Road so we're
11 perfectly accurate as to what happened
12 a second ago.
13 Q.    Was that the first time you were in
14 the basement of 97 Quentin Road that you just
15 described?
16 A.    Yes.
17 Q.    When was that?
18 A.    I don't know.
19 Q.    What year?
20        MR. SCHOENE:  I think he already
21 said late 2005 or early 2006.
22        MR. NEWMAN:  Sorry.  I'll move
23 on.
24 Q.    Did you have a camera with you the

101

Kanevsky

```
 2   first time you were in the basement?
 3   A.    No.
 4   Q.    How long were you in the basement?
 5   A.    10 minutes, 15 minutes.
 6   Q.    Was there a light on in the basement?
 7   A.    No.
 8   Q.    How did you see in the basement?
 9   A.    He used a flashlight, and later on in
10   particular he said he was able to show me
11   with the pigtail lights.
12   Q.    So, he was able to turn on a light
13   later?
14   A.    He screwed the light or turned on the
15   light.
16   Q.    It was a flashlight and an overhead
17   light used to see?
18   A.    On the stairs, yes.
19   Q.    Aside from these cracks that you saw,
20   did you observe anything else in the
21   basement?
22   A.    In that moment only what I saw is the
23   crack. I didn't have a chance to walk all
24   around the basement.
25   Q.    Did you take any photographs that day?
```

102

Kanevsky

```
 2   A.    At that time, no.
 3   Q.    When was the next time you were in the
 4   interior of 97 Quentin Road?
 5   A.    I was in there a few times. I can't
 6   recall exactly.
 7   Q.    About how many times were you in the
 8   interior of the building?
 9   A.    Two, three, four.
10   Q.    How did you get in on the other times?
11   Was the super always letting you in or
12   something else?
13   A.    I believe another time again with the
14   super, and another time the owner of the
15   building.
16   Q.    What was the purpose of going into 97
17   Quentin Road after your initial visit? What
18   was the purpose? Why did you visit the
19   interior of 97 Quentin Road after the first
20   time?
21   A.    Okay. He probably asked me about
22   complaints of the work.
23   Q.    The owner complained?
24   A.    Yes.
25   Q.    How did you hear that the owner was
```

103

Kanevsky

```
 2   complaining?
 3   A.    He stopped by. He explained to me all
 4   his complaints.
 5   Q.    What's the owner's name?
 6   A.    I don't know.
 7   Q.    When was the first time the owner
 8   complained to you?
 9   A.    He wasn't actually complaining. He
10   had concerns. I would say he had concerns.
11   Q.    What were the concerns of the owner?
12   A.    Same, cracks.
13   Q.    Cracks in the basement?
14   A.    Yes.
15   Q.    What exactly in expressing his
16   concerns to you did the owner say to you?
17   A.    He saw the cracks.
18   Q.    He said I saw cracks in the basement?
19   A.    Yes.
20   Q.    Did he say anything else to you?
21   A.    Anything else?
22   Q.    Yes.
23   A.    Yes. He said I see the cracks, and I
24   have a concern about those cracks.
25   Q.    What did you say?
```

104

Kanevsky

```
 2   A.    I explained to him my opinion how
 3   those cracks could appear, and I also offered
 4   to him when we finish our work to fix
 5   anything in the building. Same thing that we
 6   offer all other neighbors who were around the
 7   property, and we kept our word.
 8   Q.    That's excellent.
 9         MR. SCHOENE: There was no
10   reason for that.
11         MR. NEWMAN: It was a comment.
12   I'm not allowed to make a comment?
13         MR. SCHOENE: No.
14         MR. NEWMAN: Strike the comment.
15   It's not allowed at the deposition.
16   Q.    You said you had an explanation for
17   the cracks. What was the explanation that
18   you gave?
19   A.    From my point of view that building
20   used to have very poor maintenance.
21   Q.    Poor maintenance. Okay.
22   A.    Not poor maintenance. Very poor
23   maintenance, first of all, and the second,
24   very poor quality of building. For example,
25   in the same cracks that we're talking about
```

105

Kanevsky

2  you were not able to see any reinforcement
3  bars.  That means the foundation wall had to
4  be poured without reinforcement bars.
5  Q.    It's your testimony that there are no
6  reinforcement bars in the foundation wall?
7  A.    In his foundation?
8  Q.    Yes.
9  A.    There's no reinforcement bars visible
10  in his wall.  Not inside the crack.  Not even
11  were reinforced bars not installed, but the
12  outside of the foundation is supposed to be
13  marked through support of the bars,
14  reinforcement bars.  So, there's no visible
15  marks -- let me explain.  Let me rephrase.
16  Q.    Please do.
17  A.    In order to install the foundation
18  there's a support bar.  You have to install
19  horizontally some type of support, and that
20  support is suppose to go through the wall
21  completely and suppose to sit right on the
22  forms.  So, when you open the forms, those
23  supports are suppose to stick out from the
24  concrete.  There is no visible marks of those
25  supports.  So, I assume there is no

106

Kanevsky

2  reinforcement bars in this foundation.
3  Q.    Was it your assumption then in that,
4  from your perspective there doesn't appear to
5  be reinforcement bars that's the cause of any
6  cracks that appear in the foundation of 97
7  Quentin Road?
8  A.    Oh, sure.
9  Q.    When you refer to the fact that there
10  was either poor maintenance or no
11  maintenance, what is that based on?
12  A.    Very simple.  When we're together with
13  you inspecting the roof, I point to you
14  exactly a lot of places on the roof where
15  water penetrate from the roof, and everybody
16  knows the leaking of water from the roof
17  could bring down the whole building, not only
18  cracks.
19  Q.    So, in other words --
20  A.    Especially if it's a wood structure.
21  Q.    When you looked around the structure,
22  you saw that there were leaks or a poorly
23  maintained roof; is that your testimony?
24  A.    You saw that.  The leaks was all over.
25  Q.    Right.

107

Kanevsky

2  So, I'm asking is that your testimony,
3  that one of the problems as far as poor
4  maintenance is that the roof was a leaky
5  roof?  Is that your testimony?
6  A.    You asked me two different questions.
7  The question regarding the concrete
8  foundation wall, I answered that question.
9  Q.    Yes.
10  A.    Regarding the poor maintenance which
11  could get any cracks inside the building,
12  that's the water leakage.
13  Q.    So, when you observed the roof, you
14  saw that it was a leaky roof?
15  A.    All over.
16  Q.    All over.
17  Now, did you inspect the roof prior to
18  the demolition?
19  A.    No.
20  Q.    Did you inspect the roof prior to the
21  excavation?
22  A.    No.
23  Q.    Did you inspect the roof prior to
24  construction of the steel?
25  A.    No.

108

Kanevsky

2  Q.    Did there come a time that you erected
3  scaffolding on the roof of 97 Quentin Road?
4  A.    Say it again.
5  Q.    Did there come a time that you or your
6  company or somebody erected scaffolding on
7  the roof of 97 Quentin Road?
8  A.    Yes.
9  Q.    When was that?
10  A.    A year ago, year and a half ago.
11  Something like that.
12  Q.    Did you obtain the permission --
13  A.    Two years ago.
14  Q.    Did you obtain the permission of 97
15  Quentin Road before you erected scaffolding
16  on the roof of 97 Quentin Road?
17  MR. SCHOENE:  The last question
18  was you or someone else, and now
19  you're saying you.
20  MR. HENMAN:  Let me clarify it.
21  Q.    Did you obtain the permission of the
22  owner of 97 Quentin Road before you
23  constructed scaffolding on the roof of 97
24  Quentin Road?
25  MR. SCHOENE:  Objection.

109

Kanevsky

There's been no testimony that he
constructed any scaffolding on the
roof of 97 Quentin Road.

Q.    Who erected scaffolding on the roof of
97 Quentin Road?

A.    O.M.I.

Q.    Who hired O.M.I.?

A.    Me.

Q.    When?

A.    2004.

Q.    Did O.M.I. ever obtain the permission
from the owner of 97 Quentin Road before they
erected scaffolding on the roof?

A.    Yes.

Q.    They did?

A.    Yes.  That's how we met.

Q.    Prior to us meeting in court, did
O.M.I. obtain the permission of the owner of
97 Quentin Road before erecting scaffolding
on the roof of 97 Quentin Road?

Do you understand my question, because
I'll simplify it?

A.    Simplify it.

Q.    I know you and I met.  We met in

110

Kanevsky

Brooklyn Supreme Court, and we got a
settlement agreement where certain monies
were paid for that scaffolding that was
erected on the roof, correct?

A.    Yes.

Q.    Prior to there being a court action
about the scaffolding, did O.M.I. approach
the owner of 97 Quentin Road to ask for
permission to put scaffolding on the roof?

A.    Yes.  Sure.

Q.    Prior to the court date?

A.    Sure.

Q.    When was that?

A.    I don't remember the date, but we talk
to the owner a lot of times.  Not a lot of
times, but a few times.

Q.    What did the owner say?

A.    What did the owner say?  I believe he
didn't say anything.

Q.    Did the owner give O.M.I. permission
to build a scaffolding on the roof?

A.    I don't think so.

Q.    So, did O.M.I. build the scaffolding
on the roof after the owner said they could

111

Kanevsky

not build the scaffolding on the roof?

A.    First of all, the owner never said no.
Second, I don't remember when we ever build a
scaffolding on the roof before we get the
permission.

Q.    I will ask it a different way.

Prior to the scaffolding being
constructed on the roof of 97 Quentin Road,
did Bill Aftousmis, the owner of 97 Quentin
Road, ever give permission to O.M.I. to
construct that scaffolding on the roof prior
to the court date?

A.    I don't remember any scaffolding built
on the roof prior to getting permission.
What scaffolding are you talking about?

Q.    Scaffolding built on the roof of 97
Quentin Road to construct bricks on the steel
scaffolding.

MR. SCHOENE:  Construct bricks?

MR. NEWMAN:  To install bricks.

A.    I don't know what you're talking
about.

Q.    Okay.  I'll show you photographs
later.  It's not a problem.

112

Kanevsky

A.    Oh, you're talking about on the first
floor?  That's what you're talking about?

Q.    I think this might help.  Then we'll
move on.

There is scaffolding here, right, to
put the bricks, and there was scaffolding on
that piece as well, correct?

A.    On this building appears two levels of
the roof.

Q.    I know that.

A.    One is the three stories, and another
one is the one story.  Very, very small.

Q.    Yes, sir.

A.    There's no scaffolding on that roof.
Over that roof, but not on the roof.  Yeah,
we did use a space over there, but we didn't
put scaffolding on the roof actually.  We
used the parapet for that.

Q.    You used the parapet of the building?

A.    Yes.

Q.    Of Bill Aftousmis' building?

A.    But not on the roof.  The size of the
roof is this big.

Q.    I'll ask it this way, and then we're

113

Kanevsky

1

2  going to move on.

3      Did there come a time that you built

4  scaffolding on the parapet of Bill Aftousmis'

5  building?

6  A.    Excuse me?

7  Q.    Did there come a time when O.M.I.

8  constructed scaffolding on the parapet of

9  Bill Aftousmis' building at 97 Quentin Road?

10 A.    On that portion?

11 Q.    Yes.

12     The parapet, the ledge, did O.M.I.

13 ever construct scaffolding there?

14 A.    Yes.

15 Q.    When did they do that?

16 A.    A few years ago. Two years ago.

17 Q.    Did O.M.I. ever receive permission

18 from Bill Aftousmis to construct scaffolding

19 on the parapet of 97 Quentin Road?

20 A.    I don't know.

21 Q.    Isn't it a fact, sir, that there was

22 another set of scaffolding that was built on

23 the roof of 97 Quentin Road, on the actual

24 roof? Didn't that occur at some point?

25 A.    That was not scaffolding.

114

Kanevsky

1

2  Q.    What was it? What do you call it?

3  A.    That was -- how you call it -- like a

4  safety bridge. That was not used for the

5  erection of the brick or something else.

6  That was used to prevent if something falls.

7  Q.    Was there a structure that was built

8  on the roof of Bill Aftousmis' building at 97

9  Quentin Road that was constructed so as to

10 allow brick to be installed in the adjacent

11 building?

12 A.    Again, please.

13 Q.    Was there some sort of structure that

14 was constructed on the roof of Bill

15 Aftousmis' building that would allow workmen

16 to mount that structure so that they could

17 install brick in the adjacent structure?

18 A.    After we had the permission, yes.

19 Q.    But not before?

20 A.    Not before.

21 Q.    Do you know what a footing is?

22 A.    Yes.

23 Q.    What is a footing?

24 A.    A footing is a part of the foundation

25 that lays directly on the soil. Hopefully

115

Kanevsky

1

2  it's virgin soil which is able to support the

3  foundation wall. The other part of the

4  structure, it takes all the load from the

5  building and transfers it to the soil.

6  Q.    Is the footing important in

7  maintaining the structural integrity of a

8  building?

9  A.    Is the footing --

10 Q.    Important.

11 A.    Yes. Very important.

12 Q.    Why is it very important?

13 A.    I just explained it, because it

14 collects and transfers all the weight of the

15 building.

16 Q.    In doing the construction and

17 excavation next to 97 Quentin Road was there

18 a time that the footing that formed part of

19 the structure of 97 Quentin Road was cut?

20 A.    Footing?

21 Q.    Footing. Was it cut?

22 A.    Footing was cut? I would say no.

23 Q.    So, no footing belonging to 97 Quentin

24 Road was ever cut or altered in anyway; is

25 that correct?

116

Kanevsky

1

2  A.    Yes.

3  Q.    If you can explain, I'll be happy for

4  you to explain.

5  Q.    Should I?

6  Q.    Yes. That's what you're here to do.

7  A.    The proper way to install the footing

8  is complete forms in the ground and laying

9  the concrete. So, in this case you're able

10 to control the dimensions of the footing. In

11 that particular building no one used the form

12 and they poured the concrete directly into

13 the ground.

14 Q.    By that particular building you're

15 referring to 97 Quentin Road?

16 A.    Yes. They used to pour the concrete

17 directly in the ground. So, the footing

18 itself, the shape of the footing, was not

19 straight, and partially it was sitting on our

20 property. That portion was nicely cut off.

21 Q.    I see.

22     So, in other words, the footing that

23 was part of the structure of 97 Quentin

24 Road -- go ahead. Correct me.

25 A.    It was not part of the structure.

117

Kanevsky

Q.    Explain.

A.    The part of the structure is exactly as much as you need under the wall. Whatever sticks out is not a structure anymore.

Q.    Just so I understand your distinction, is it fair to say that it was during the excavation that you discovered this sticking out of the footing?

A.    During the underpinning. Even prior to excavation.

Q.    During the underpinning did you observe that there was a piece of the footing extending out into the area that was to be the area where the new building was constructed?

A.    I would say I observed pieces of the foundation -- not the foundation -- pieces of the concrete related to the building sticking out of the property line.

Q.    Out of the property line?

A.    Yes.

Q.    Do you recall the first time you observed that? Do you recall the first time you observed that footing sticking out of the

118

Kanevsky

property line? When was the first time you saw that?.

A.    In the very beginning.

Q.    What year?

A.    2004.

Q.    Did you do anything once you observed that?

A.    No, I did not.

Q.    Did you speak to any professional engineer about that, about this footing sticking out over the property line?

A.    Yes, I did.

Q.    Who did you speak to?

A.    Aislem Aamer.

Q.    What did you say to him?

A.    I just showed him.

Q.    Did you take any pictures of that structure?

A.    Probably, yes, but this is standard procedure. This is nothing new.

Q.    What did he say to you when there was a structure sticking out from Mr. Aftousmis' building onto your property line? What did he say to you?

119

Kanevsky

A.    He measured the width and the thickness of the footing in other places where those pieces of the concrete is not sticking out, and they simply decide that whatever we cut off is not related to the building, and this is standard procedure. It happens all over.

Q.    Who made the decision to cut off that structure that was jutting out? Who made that decision?

A.    No one is suppose to make a decision about that. It's standard procedure. Everybody does it. If you catch this problem, that's what you have to do. It's by the book.

Q.    Once you caught the problem did you say something to somebody about getting rid of that structure that was sticking out?

A.    I would say everybody involved in this project knew about it.

Q.    They knew about it?

A.    Yes, and this is just nothing. It's just standard.

Q.    So, once they all knew about it what

120

Kanevsky

happened next? How was it put into play that that piece was cut?

A.    Very simple. With chain saw. With sledge hammer. Very simple.

Q.    Did you watch that piece of the structure being cut?

A.    It was a few of them. Some of them really small. Some of them a little bit bigger.

Q.    Did you watch --

A.    I watched.

Q.    How long did it take; an hour, half a day, to cut them?

A.    That was performed at different times. Altogether I don't know how much it takes. For example, one day we were working in this area and maybe it took half hour. Another day two hours. Another piece, maybe it took us two or three days.

Q.    How many pieces did you cut off that were adjoining into your property?

A.    I don't remember.

Q.    Was it 20, 10?

A.    What do you mean by pieces? What

121

Kanevsky

1
2  should I consider a piece, like this big or
3  the table size? What do you consider a
4  piece?
5  Q.  I'll move on. It's okay.
6        MR. NEWMAN: Can you mark this?
7        (Whereupon a document entitled
8  Affidavit dated 7/31/07 was marked
9  Plaintiff's Exhibit 3, for
10  identification as of this date.)
11  Q.  You testified that from your
12  perspective there was poor maintenance
13  because water was coming in and the building
14  wasn't constructed properly because the steel
15  reinforcement wasn't there. Was there
16  anything else about the construction of this
17  building that you believe caused cracks to
18  form in the building at 97 Quentin Road?
19  A.  Yes, I do.
20  Q.  What was that?
21  A.  There is two main issues in that
22  building. First of all, the appearance of
23  the laundromat. In order to install those
24  laundromats in the building they used to
25  build piles in order to support the concrete

122

Kanevsky

1
2  slab. I believe it's 18 inches thick to
3  support all the machines, and those piles
4  used to penetrate existing all concrete slab
5  in the building in order to build all those
6  piles, same footings. So, the crack that we
7  observed in the basement goes right along
8  those piles.
9  Q.  Anything else about the construction
10  of the building?
11  A.  Yes.
12  Q.  What is that?
13  A.  That slab is not structural anyway,
14  but it's just those cracks in the slab just
15  simply show the interruption of the
16  foundation that used to be done when those
17  piles were used to be built. Second, in that
18  building they have a water collector which
19  they used as a filter for used water from the
20  laundromat machine, and that water prior to
21  going to the City sewer goes to the concrete
22  pit in the basement, which I believe has the
23  same cracks as the slab. So, the water
24  penetration, permanent water penetration from
25  that water collector also could damage the

123

Kanevsky

1
2  foundation.
3  Q.  Is that the reason why there are
4  cracks in the cement basement slab?
5  A.  We can only assume.
6  Q.  Assume.
7  A.  Yes.
8  Q.  Was there any notice given to Bill
9  Aftousmis prior to the excavation and
10  underpinning that that was going to occur?
11  A.  No, and I know we don't have to. We
12  have to notify all the neighbors only about
13  demolition, and that was done.
14  Q.  So, you know of no Department of
15  Buildings code regulation that you do have to
16  notify adjoining landowners if there's
17  underpinning? You don't know about that?
18  A.  I know that nobody is able to prevent
19  us to build our building on our own property,
20  and if engineers decide to do the
21  underpinning, no one is able to stop us to do
22  it. That's what I know.
23  Q.  So, in other words, if you want to go
24  ahead and do your underpinning, no one can
25  stop you; is that your testimony?

124

Kanevsky

1
2  A.  No one can stop you. I'm definitely
3  able to pull the permits from the Buildings
4  Department on the neighbor's property even
5  without his permission.
6  Q.  Even without notification?
7  A.  Even without notification.
8  Q.  So, you can do whatever you want?
9  A.  Not whatever I want to do. Whatever
10  the Buildings Department allowed me to do.
11  Q.  The Buildings Department allowed you
12  to do the excavation without any notification
13  to Bill Aftousmis at 97 Quentin Road about
14  underpinning; is that correct?
15  A.  As far as I know, yes.
16  Q.  Was there anything about the actual
17  washing machines, the vibration of the
18  machines, that caused damage to Bill
19  Aftousmis' building? Do you know about that?
20  A.  I was in that building. You used to
21  stand on the floor and you feel the
22  vibration. If you feel the vibration, you
23  think the world doesn't feel it?
24  Q.  What is your testimony?
25  A.  My testimony is that if there is

125

1                    Kanevsky
2   vibration that you feel in the building, it
3   spreads all over the building and may affect
4   any structure in the building, below the
5   machine or on top of them.
6   Q.      Did there come a time when the New
7   York City, Department of Buildings sent a
8   licensed professional engineer to test the
9   underpinning, to test and evaluate the
10  underpinning work?
11  A.      The Buildings Department sends the
12  engineer?
13  Q.      Did they ever do that?
14  A.      I don't remember that.
15  Q.      Did that ever happen?
16  A.      Unless it happened without me knowing.
17  I didn't have any appointments with them.  No
18  one called me.  No one send me a letter.  If
19  they sneaked on the property, maybe.
20  Q.      Let me ask you this.
21          Have you supervised underpinning work
22  before?
23  A.      Sure.
24  Q.      How many times?
25  A.      A lot.

126

2   Q.      100 times?
3   A.      No, not 100.
4   Q.      50?
5   A.      20, 30 times.
6   Q.      In those 20 to 30 times have you ever
7   seen a New York City, Department of Buildings
8   professional engineer come out and test and
9   inspect the underpinning?
10  A.      Yes, once.
11  Q.      One time?
12  A.      It was government project paid by the
13  City, and in those cases the Buildings
14  Department's engineers are always on the job
15  site.  So, they inspect the underpinning.
16  Any City job works this way.
17          MR. NEWMAN:  Let's have this
18          marked as Plaintiff's Exhibit 4.
19          (Whereupon a document entitled
20          Cellar and Party Wall Condition
21          Inspection Report dated 5/19/05 was
22          marked Plaintiff's Exhibit 4, for
23          identification as of this date.)
24  Q.      Sir, I'm showing you Plaintiff's
25  Exhibit 4, and I'll ask you if you have ever

127

1                    Kanevsky
2   seen this document before?
3   A.      I did not.
4   Q.      I'm going to show you a couple of
5   pictures.
6           MR. NEWMAN:  The title is Cellar
7           and Party Wall Condition Inspection
8           Report dated May 19th of 2005.  The
9           name of the PE that prepared that
10          report is Wiktor Wasilewski.
11  Q.      On Page 4 of six pages there are two
12  photographs.  I'm going to point your
13  attention to Photograph Number 1, which says
14  diagonal crack in the south wall.  Do you see
15  that photograph?
16  A.      Okay.
17  Q.      Have you ever seen that crack prior to
18  today looking at that photograph?
19  A.      I don't remember.  I told you there
20  were a lot of cracks.
21  Q.      Now, there's a crack on Photo Number
22  2.  It shows a crack on the cement slab.
23  A.      Yes.
24  Q.      Have you ever seen that crack in the
25  basement?

128

1                    Kanevsky
2   A.      Yes.  This is the piles that I used to
3   talk about, and this is the crack along the
4   piles.
5   Q.      When was the first time you saw that
6   crack on the cement slab as depicted in Photo
7   Number 2?
8   A.      I don't remember.  It was much earlier
9   than the first time I went in the basement
10  with the owner.  I'm sure I saw it before.  I
11  didn't inspect the basement, but I'm sure I
12  saw this.
13  Q.      Before you were in the basement with
14  Bill Aftousmis?
15  A.      With Bill Aftousmis.  I used to be in
16  the basement before Bill Aftousmis a few
17  times, one or two times.  I definitely saw
18  this crack before.
19  Q.      Did you ever put any crack monitors
20  down on any part of Bill Aftousmis' building?
21  A.      Yes, from my side.
22  Q.      Why did you do that?
23  A.      Because when they point me to the
24  cracks, I had to monitor the cracks.  In this
25  case I was able to assess those cracks were

129

Kanevsky

1
2  movable, still movable.  So, it belongs to
3  any activities, or are they stable.  That
4  means they not belong to any activity as
5  excavation and underpinning.  So, I monitored
6  those cracks, and I do have a picture of
7  those monitors.
8  Q.    What did the crack monitors show?
9  A.    They didn't move they showed.
10 Q.    Where did you put the crack monitors?
11 A.    On a few places on this wall.
12 Q.    How many?
13 A.    There was a few of them.
14 Q.    Did you do any monitoring of Bill
15 Aftousmis' building during the excavation?
16 A.    Yes, I do.
17 Q.    What kind of monitoring did you do
18 during the excavation?
19 A.    Okay.  During when I hammered the
20 piles, and the piles went on this line --
21 Q.    Yes.
22 A.    -- I hired a company that monitored
23 the vibration of the ground.
24 Q.    What was the name of the company?
25 A.    I don't remember.  It's in my records.

130

Kanevsky

1
2  On this property we worked with many.  I
3  don't remember the name.  It's in my file.
4  Q.    All right.  We'll get it eventually.
5        Was there only that company or were
6  there other companies that did monitoring
7  during the construction next to 97 Quentin
8  Road?
9  A.    What do you mean by monitoring?  If
10 you're talking about vibration, you monitor
11 vibration.  If you're talking about the
12 cracks, yes, I put the test on the cracks.
13 Q.    What I'm referring to is nothing else,
14 just the monitoring of the vibrations.
15       Was there anyone else aside from the
16 company that you can't recall the name of,
17 but you're recounting, was there another
18 company?
19 A.    That's what came up in my mind.
20 Q.    The company that was hired to do the
21 monitoring, were they monitoring the
22 construction site while the underpinning was
23 done?
24 A.    Actually that company was monitoring
25 all stages of construction.  They used to

131

Kanevsky

1
2  monitor moving concrete, stress, steel
3  erection, fireproofing.  Everything.
4  Everything of what we're suppose to monitor
5  by the Buildings Department and technical
6  responsibility of the engineers on this job.
7  Q.    When you say monitoring, what were
8  they doing?
9  A.    They're supposed to be on the job site
10 exactly at the time when they're able to
11 check the progress and make a report of it.
12 Q.    Was it mostly in terms of vibration
13 monitoring?
14 A.    Everything.  Each stage of the
15 construction from the very beginning to the
16 very end.
17 Q.    Did this company do vibration
18 monitoring when the excavation was done?
19 A.    There is no vibration from the
20 excavation.
21 Q.    Were there any vibrations that are
22 created when doing the underpinning?
23 A.    No.
24 Q.    Okay.
25       Were there piles put in adjacent to 97

132

Kanevsky

1
2  Quentin Road?
3  A.    No.
4  Q.    I'm showing you Page 5 of 6, and I'm
5  going to show you Photograph Number 3, but
6  before I do that, what's the east footing
7  wall in the diagram?  Do you know what that
8  means?
9  A.    No.
10 Q.    Now I'm going to show you Photograph
11 Number 4 and ask you is this the underpinning
12 that you were referring to in your testimony,
13 at least a fair depiction of a portion of the
14 underpinning?
15 A.    What portion of the underpinning are
16 you talking about?
17 Q.    I'm directing your attention to
18 Photograph Number 4, and I'll ask it this
19 way.  Do you recognize that photograph?
20 A.    I do recognize this wall.  I don't
21 recognize this photograph.  Maybe it's not
22 mine.  I can't see exactly what's in that
23 portion of this photograph.  It's too small.
24       MR. SCHOENE:  Let the record
25 reflect that it's actually a photocopy

113

1           Kanevsky
2       of a photograph.
3       Q.    In Photograph Number 4 of Plaintiff's
4   Exhibit 4 I'm directing your attention to
5   this material above these concrete blocks two
6   and three.  What I'm pointing my finger at,
7   is that dry packing?
8       A.    No.
9       Q.    What is that material that I'm
10  pointing to?
11      A.    This is old material from the old
12  wall.  Maybe even from -- this photograph is
13  too small.
14      Q.    In Photograph Number 4 do you see any
15  dry packing in that photograph?
16      A.    Too small.  Show me the original
17  picture.  It might be much easier.
18      Q.    Photograph Number 3, have you ever
19  seen what this depicts there?  Does that look
20  familiar to you in anyway?
21      A.    Oh, yeah.  This is the wall of the
22  building.  This is the wall that used to be
23  underground.  Not even underground, because
24  the neighbor's building that was demolished
25  had a basement.  So, this wall never went

114

1           Kanevsky
2   under the soil.
3       Do you have a bigger picture of this?
4       Q.    Not right now.  I will try to get you
5   bigger pictures.
6           MR. SCHOENE:  You weren't
7       suppose to ask him any questions.
8           MR. NEWMAN:  There's been a
9       reconciliation, uncommunicated, but --
10      Q.    Here's my question to you.
11      There are two cracks that I can see.
12      A.    I can see them too.
13      Q.    My question is, those two cracks, is
14  that something that you saw prior to
15  construction beginning or something else?
16      A.    Yes, I do.  Those cracks I saw prior
17  to construction.  If you're able to show me
18  the same picture in the actual size, on the
19  same picture I will show you why this crack
20  appears only on the foundation wall, and
21  right under the crack in the footing there is
22  no crack.  It means that the footing is still
23  stable and still able to hold the building,
24  and the cracks in the foundation wall appear
25  only because there is no rebars inside the

115

1           Kanevsky
2   wall.  So, concrete simply cracks itself even
3   without any stress, and in order to prevent
4   it from cracking we use reinforcement bars.
5       Q.    We're going to move on.
6       In Photograph Number 3 is there any
7   underpinning in the bottom of the photograph?
8       A.    It's very difficult to say.  It may be
9   right here, but to know for sure I would have
10  to see -- it seems like it's here, but I'm
11  not sure.
12          MR. NEWMAN:  By here the witness
13      is referring to the bottom fifth of
14      the photograph.
15      Q.    I'm going to show you Page 6 of 6, and
16  I'll direct your attention to Photograph
17  Number 6, and ask if what's depicted in that
18  photograph is familiar to you in anyway?  Do
19  you recognize what is depicted in this
20  photograph?
21      A.    I recognize what's in those photos.
22      Q.    Is this part of the underpinning --
23  I'm pointing to Photograph Number 6 -- that
24  was constructed under Bill Aftousmis'
25  building?

116

1           Kanevsky
2       A.    I believe this in the old concrete
3   which sticks out from the building.  I don't
4   see any underpinning here.
5       Q.    Photograph Number 5, do you recognize
6   what is being depicted in Photograph Number
7   5?
8       A.    Yes, I do.
9       Q.    What is it?
10      A.    It's this part of the wall.
11      Q.    Do you know if it's north or south?
12      A.    No.  He calls it north on Picture 5.
13  It's the north wall.  This is this wall.
14      Q.    I think you testified that it was, but
15  in this photograph can you tell if there's
16  any underpinning that was constructed?  This
17  is Photograph Number 5.
18
19
20
21
22
23
24
25

137

Kanevsky

A.    I can't tell on this photograph

anything, but that wall used to be

underpinned.  We did underpin that wall, but

in this photograph you can't see that.

Q.    I think we're going to stop here, and

unfortunately we're going to have to bring

you back for a second time.  We'll do it at

your convenience, collective convenience, but

we have to do a second session because these

fellows want to ask you questions.  I

apologize for that, but we started when we

did and that's unfortunate.

            (Time noted:  4:30 p.m.)


            -------------------------

                MARK KANEVSKY



Subscribed and sworn to before me

this    day of        2008.

---------------------------------

    Notary Public

---

138

| PLAINTIFF'S FOR IDENTIFICATION | DESCRIPTION | PAGE |
|---|---|---|
| 1 | A photograph | 28 |
| 2 | A diagram drawn by Mr. Kanevsky | 48 |
| 3 | A document entitled Affidavit dated 7/31/07 | 121 |
| 4 | A document entitled Cellar and Party Wall Condition Inspection Report dated 5/19/05 | 126 |

EXHIBITS

---

139

        C E R T I F I C A T E

    I, CAROLYN PALADINO, hereby certify

that the Examination Before Trial of MARK

KANEVSKY was held before me on the 13th day

of May, 2008; that said witness was duly

sworn before the commencement of his

testimony; that the testimony was taken

stenographically by myself and then

transcribed by myself; that the party was

represented by counsel as appears herein;

    That the within transcript is a true

record of the Examination Before Trial of

said witness;

    That I am not connected by blood or

marriage with any of the parties; that I am

not interested directly or indirectly in the

outcome of this matter; that I am not in the

employ of any of the counsel.

    IN WITNESS WHEREOF, I have hereunto set

my hand this 3 of June        2008.

        Carolyn Paladino

        CAROLYN PALADINO

---

140

ERRATA SHEET

| PAGE/LINE | CORRECTION |
|---|---|

refer 106:9
referred 45:16
referring 66:24 89:21 116:15 139:13
    172:12 135:13
reflect 52:9 100:9 132:25
refusal 6:12
refuse 78:11
refuses 22:17
regard 71:25 88:25 89:9,25 90:8 91:4
regarding 107:7,10
regular 65:20 69:25
regulation 123:15
reinforce 56:24
reinforced 97:11 101:10
reinforcement 105:2 4:8,9,14 106:2,5
    121:15 131:4
related 36:16 21:9 23 3:5 4:5 17:9:6,
    117 19:13 6:6
relation 28:9
relevance 16:22
relevancy 71:25 17:25 23 18:6,15
relief 3:14
remainder 6:16
remember 62 3:8,22 35:6 26 14:39:22
    39:23 42:6,18 94:44 5:6,10 18:8
    55:4 19 11:6 6:12 6:6 10:71 11:73 8
    7:3 10:14 18 16:23 74:7:25 20:21
    38:18 91:2 92:15 116:15 114:4,24
    120:23 125:24 127:19 128:8 129:25
    130:3
remind 23:13
rep 66:22 67:2 68:21
rephrase 20:8 50:14 9:22 64:4 79:14
    98:17 105:15
replaced 75:16
report 27:18 126:21 127:6 130:11
    130:10
reporter 20:17 31:24 32:6 34:19
reporter's 10:19
REPORTING 1:22 2:21
represent 9:16
representation 58:9 44 24:66:16
representatives 63:5 7:6 7:18
represented 139:14
representing 22:9
request 5:19
required 45:9
reserved 7:14,18
respect 53:10
respective 5:4
respond 31:18 32:1
responding 21:23
response 32:4
responses 9:22
responsibilities 26:24
responsibility 131:6
responsible 37:15,18,21,23 38:1 45:6
responsive 14:9 25:8 5:13
rest 82:11
result 60:13 87:5

return 7:22
rid 119:18
right 5:13 p.5,16 7:12 16 19,20 22:21
    25:13 32:16 41:5 47:7,12 52:4 53:13
    62:10 71:9 22:22 79:16 88:7,19
    97:24 98:22 100:21 106:25 112:6
    122:7 130:4 134:21 135:9
rights 7:11,25
river 82:7
RIVKIN 4:8
Road 27:14,23 28:6,11,24 29:11 30:16
    31:2,3 33:7,16 34:5,8,10,24 35:5,16
    36:14,24 38:7,14,19 40:4,11,17 41:8
    41:12 42:15 16 23 47:4,21 49:4,10
    50:6 52:14 57:17 60:13,17,24 61:18
    61:23 62:9 63:10 17,19 64:6,7,15,23
    64:25 65:3,15,16 68:22 69:15 71:15
    77:18 90:3 91:4,14,17,23 94:5,13
    94:25 95:9,13,18 98:14 104:11,12
    104:15 105:4,17,19 106:3 107:3
    108:15,16,22,22 109:4,6,13,20,21
    110:9 111:9,11,18 114:9,19,23
    114:9 115:17,19,24 116:15,24
    124:10 134:11 135:8 132:2
roads 54:16
role 28:5 66:20 67:9,25 68:3,11 75:5
    76:6
roles 12:12
roof 106:13,14,15,16,23 107:4,5,11,14
    107:17,21 108:3,7,16,25 109:4,5
    109:14,21 110:5,10,22,25 111:2,5,9
    111:12,15,17 112:10,13,16,18,23
    112:24 113:2,5,24 114:8
rule 5:5,8,22,24 6:11
rules 5:6 6:24 7:25 16:24 116:8,10,14
    22:4,20
ruling 18:21
Russia 54:21 56:6
Russian 19:25

S 3:2 4:2 5:2 p.9 7
safety 114:4
salaried 13:25
saw 29:2 61:24 62:5 71:12 76:7 83:12
    83:21,24 85:6 89:7,9 97:3 99:16
    101:19,22 102:17,18,19 104:24
    107:14 118:3 120:4 128:5,10,12,17
    131:14,16
saying 31:23 18:22 36:14 50:13 72:25
    76:18 80:18 91:10 95:7 98:5
    108:19
says 29:17,21 30:7 127:11
scaffolding 103:18,15,23 109:3,5,11
    109:20 110:4,8,10,22 111:3,12,18
    111:12,14,16,17,19 112:6,15,18
    112:4,18,15,18,22,25
schedule 79:6
SCHOENE 3:15 16:21 17:2,7,21 18:9
    18:13,22 19:24 17:25 2,8,24 30:14

10:18 13:5,18 14:25 23:11,21 34:6
    37:22 38:22 49:9,22,25 44:18
    48:10 56:9 53:5,17 63:11 66:6,9,24
    71:7,19 78:19 98:13 100:5,21 101:9
    104:13 108:17,25 111:20 132:24
    134:6
screwed 101:14
SCUNZIANO 4:3
second 1:15,19 to 22 23 5 50:20 66:7
    66:10 74:10,21 86:14 87:16 100:13
    104:21 111:4 112:17 137:8,10
secretary 13:17,18,20
Section 6:25
sectional 81:22
see 18:22,25 20:11,14 47:10,25 62:7
    62:13 63:2,6 69:5 72:8,10 74:21
    78:10 81:22 92 9,13,19 96:14 98:22
    99:18 101:8,17 103:23 105:2 116:21
    124:10 134:11 138:11,12
    135:10 136:4 137:5
seen 28:24 29:5 126:7 127:2,17,24
    133:19
self-employed 111 10,11 11:3 15:16,18
    33:9
send 125:18
sends 125:11
sent 129:7
series 9:17
SERVICE 8:22 21
session 131:10
set 6:23 19:13 112:12 139:20
settlement 139:1
sewer 121:21
shape 116:18
shelf 25:1,12
She 89:2 2
shoe 99:9
sewing 9:7 43:20 46:18 47:19 84:17
shoes 19:20 96:11,12
short 37:19
show 59:19 64:9 23 77:20,23 100:6
    101:10 118:24 122:15 127:4 129:8
    132:5,10 133:16 134:17 139:5:15
showed 94:21 118:17 129:9
showing 29,21 39:17 126:24 132:4
shows 127:22
shown 69:25 90:3
side 46:14,15 128:21
sign 28:23,24 29:17,9,10,17,24 30:8
    32:21
signed 7:20
significant 8
similar 86:18
single 13:4 92:12 106:12 120:4,5
simplest 21:20 22:12
simplify 109:23,24
simply 44:7 25:16 60:14,23 84:11
    94:9 96:4 98:8,23 119:5 122:15
    135:2
sir 6:15 11 5:14 4:17:14 18:20:22

statements 5:25
States 54:7 5:7,9,4,13,21 77:19
    stay 97:22
stayed 88:11,13
steel 107:21 111:18 121:14 131:2
stenographically 139:9
Steven 5:5
STEVEN A 1
stick 105:21
sticking 117:4,19,24 118:23 119:5
    131:19
sticks 117:5 136:3
STIPULATED 5:3
stop 81:3 125:21,25 124:2 137:6
stopped 83:7,8,9 101:1
stops 98:24
stored 56:20,21 25
stories 112:12
story 112:11
straight 116:19
stream 82:7
streams 81:4
Street 9:13 91:17
stress 131:2 115:3
strike 7:9,13,16 20:11 21:19:22 25:104:11
structural 45:16 117:22,23
structure 66:12,17,24 62:8 98:7
    105:20,21 111:7,13 16:15 114 4:19
    116:23,25 117:3,21 118 18:23 19:19
    119:19 120:7 125:4
structures 62:18
stuff 91:10 117 78:22
sub 56:23
subcontracted 50:9
subcontractor 28:5
subcontractors 27:13 24 78:14
subdivision 6:11
subdivisions 5:8
subject 5:32
Subscribed 137:20
successive 6:4
succinctly 5:17 7:2
suggest 5:18
Suite 1:4,20
sun 98:5
super 46:2,8 11,13,24 25 95 8,12,18
    97:10,15,19 98:1 22 102:11,11
supervise 97:4,10 16
supervised 69:14 83:21
supervise 97:4,16
supervision 18:21
supervisor 76:7
supervisory 23:19
super's 96:6
supplier 77:22
suppose 56:16 25 57:5 70:6 71:20
    105:13,18,19,20 115:2 121:25 122:3
    125:24 124:10
support 105:23,25
suppose 26:17 12:12 88:7 105:20,21
    time 7:6,17 22:22 24:5 25:9 29:6

195:23 119:12 131:4 134:17
sometime 48:17:25 3:74:16 104:12
    131:9
Supreme 1:1 132:1
sure 24:19 25:17 27:18 30:23 31:15
    48:3 52:20 13:4 59:6 60:6 78:18
    82:25 85:25 88 23:91 1,11,22 99:4
    94:20 98:11 125:25 128:10,11 135:9
    136:3 137:14,19 138:9
    sworn 4 21:9 1:11:7 20:19:7

T 5:2 7:1 119:22 2
table 17:1 5
take 11:23 38:9 32:13 12:17:47 3:48:6
    53:2 56:19 57:22 64:17 70:23 71:13
    77:7 88:9 94:20 97:19 102:12
    93:10 104:25 118:18 120:13
taken 1:17 17:24 118:19 99 14:9 136:3
    talk 8:21 50:21 25
taking 80 9:10 84:21 91:11 16
    117:22 112:2,3 130:10,11 132:16
    tall 5:6 11:12
technical 131:5
tell 35:25 11:16,46:10 5:12 22:12,19
    72:3,14 74:7 6 112:15 19:5 31:6 4:15
    56:20 19 22
telling 21:23
tells 82:12
ten 11:32 14:11
terminology 53:23
teran 14:6 131:11
Terrace 27:3 6
test 125:8,9 126:8 131:12
testified 9:5 34:3 16 10:46 3:69 19
    95:14 45:13 18,24 95 11 11:5 7 99:15
    106:23 107:2,5 115:22 121:25 124:24
    125:4 12,24 133:4
Thank 2:12
thick 122:2
thickness 119:3
thing 31:19 92:5 8,16 67:20 22:22 53:6
    78:3 104:5
things 71:22 5:22
thinks 22:4 31:8 22 9:13 35 6 49:18
    40:25 41 4:60 4:5 71:21 88:8 91:16
    92:15 100:21 101:23 124 4:24
    136:11 137:6
third-party 119:13,15,19 3:8,13,17
    1:10:4 5:5,9
thought 97:22
    to-eight 90:22
thrown 127:3 31 68:18 78:7 89:25
    102:23 102:9 112:12 120:10 133:4
    ticket 92:23
    time 7:6,17 22:22 24:5 25:9 29:6

56:13,19,19 61:5,8,14,23 65:3,10,11
    77:16 80:9 81:7 83:11 87:5,5,6,8
    94:5,19 95:3,9 100:14 101:2 102:2
    102:3,13,14,20 103:7 108:2,5 113:3
    113:7 115:18 117:23 124 118 2:121:6
    126:11 128:3,9 131:10 137:8,14
    times 91:10 102:5,7,10,10 116,17
    120:15 123:24 126:8,24 128:11,17
    title 68:4 8,12 18 69:6 3:6 127:6
    today 2:19 4:11 6:15 21:25 128 127:18
    told 38:8 74:8 85:5 98 4:12 3:19
    tone 22:3,6 8
    Tom 72:16,17 18 74:4
    top 82:15 12:5 4
    trained 56:6
    transcribed 139:10
    transcript 139:12
    transfers 123:5,14
    translator 19:23 20:2
    trial 2 13 6:7 18 139 4:13
    tried 22:23 92:2
    truck 58:24
    true 10:12 119:12
    try 9:20 32:18 124:4
    trying 16:2 5:9 96:21 98:8
    TUFFY 3:21
    turn 101:12
    turned 90:5,11,16 101:14
    turning 89:11
    two 12:18,22 20 22:24 21:21 24 18 28:13
    30:20 35:14 39:15,16,18 42:20
    48:16 53:5 57:8 62:13 87 68:14
    79:25 86:6 102:9 107:6 112:5
    112:9 113:16 120:19,20 121:21
    127:11 128 17:133:5 134:11,13
    type 35:13 57:1 71:13 80:13 105:19
    types 78:16
    Typically 70:7

U 5:2 12:5
Ukraine 54:13,19,20
ultimately 87:20
uncommunicated 134:9
underground 61:5,8 81 4,25 82:9,10,
    82:11 84:9 85 24:85 12:87:14 123:21
    underpin 52:22 137:4
    understand 137:4
    underpinning 37:19 40:7 45:20 46:4
    62:24,23 48 4:7,23 49:3 51:25 52:11
    52:12,13,19,23,25 53:21,23,25 54:1,22
    56 8:9,10,21,24 57:13,14,16,20
    58:25 59:10,13,15,16,21 60:4 62:11,21
    69:12,20,21 70:6 78:15 14 88 4:72 13
    73:6,19,23 74:3 127:25 76:4 79:8,17
    77:6 84:17 88:24 90 2:6 117:10,17
    123 10:11,21,24 124:14 125 1 10:21
    126:9,15 135:22 136:4,16
    understand 9:25 10 4:6,7,8,14,22 15:10

16:2 20:7,8,12 21,24 23:10,11,15
    31:14,15 20,16 24 36 2,7:8,9 42:2
    61:11 63:10 21 22:24 75:6 78 13:18
    79:13 85:20 109:22 117:6
    understanding 31:11 78:10
    understandings 76:2
    understands 23:22
    underwater 81:6 19:3" 14
    unfortunate 137:13
    unfortunately 137:3
    Uniform 5:6
    Uniondale 4:11
    United 54:7 55:6,9,13,20 77:15
    use 63:14 74:10 17,19 112:17 115:4
    usually 57:8
    utterly 21:16
    U.S. 19:13

V V: 2
    VASILEN 5:2
    venire 62:25 63:2
    vibration 124:17,22,22 125:2 129:23
    150:10,11 131:12,23 19
    vibrations 130:14 131:21
    vice-president 26 7:8,15,18,22 27:7
    68:24
    view 104:10
    violations 50:21 91:4 92:18,21,22
    91:5,9,11
    virgin 115:2
    visible 65 17 16:9 9,14,20 77:15
    visit 107:17,19
    voice 22:3
    Voronge 54:21
    Voute 2:5 13:12

    wad 10:20
    waiting 84:12 85:14 86:15
    waived 8:5
    waiver 7 5,10,17,25
    walk 63:16 102:21
    walked 64:5
    wall 46:19 47:11,13,14 60:23 66:21 66:21
    86:21 95:22 97 24,25 100:4,11
    103:16,19,20 107 8:115:1 117:4
    126:20 127:17 24 128:10 131:2
    138:12,22 23:1 130:20 133:9
    135:6 137:13 17:18
    walls 62:9,13,17,21,22,24
    wand 29:22 25
    wants 31:22
    washing 124:17
    Wasilewski 127:10
    wasn't 83:16 101:9 121:14,15

watch 120:6,11
    watched 120:12
    water 81:4,7,10,19,22,24,25 82:2,3,6
    82:12,13,16,18,20,23 83:1,10,12,18
    83:21,24 84:9,24 85 2:6,13,18,24
    86:4,19 93:9,12,18,22 94:3,5,6,9
    107:12 121:13 122:18,19,20,24
    133:4
    way 15:3,22 22:10 24:20 34:25 35:11
    37:15,17 54:20 59:2,24 64:15 68:4
    68:17 78 8 91:23,24 97:9 99:24
    weather 22:23
    week 13:23
    weight 115:14
    went 25:13 47:14 74:24 128:9 129:20
    133:23
    weren't 134:6
    Westbury 1:9
    we'll 15:2 16:18 33:24 20 11:21 24:10
    39:23 44:11 47:3 51:18 75:21 77:5
    79:2 112:4 130:4 137:8
    we're 10:11 18:20 20:6 23:14 33:16
    104:25 106:12 112:25 119:11 24:2
    137:6,9
    we've 53:11
    whatsoever 24:8 71:17
    When's 29:2
    WHEREOF 139:20
    white 3:16 58:5 96 21,23,23
    width 119:2
    Wikler 127:10
    withdrawing 53:6
    witness 7:21 8:12 21:25 22:7 23:11,14
    10:20 11 7:25 12:8,12,22 137:15
    137:16,22 139:18 19 22
    WITNESSES 1:14
    woman 4:15 8:20 96:17
    wonder 1:5,14 3:28 8,10 29:17
    33:16,17,19 34:16,20 36:21 39:6,10
    43:8,10,11 58:8,21 64:19,24 65:7,21
    96:22 97:1 98 18:25 100:10 102:2 24
    wood 74:20,22 106:20
    word 20:19 27:21 25:23,25 33:34
    63:15 78:2 104 7
    words 30:5 59:17 92 8:74 104:22 14
    86:19 92:20 106:19 116:22 123:23
    work 11:9,13 17:8 23:16 19 20:18 22,23
    21:11 24:11,16,22 25:19 14 15 53:4
    73:17 79 10,11,21 96:2,25 82 5:18,16
    80:23,25 108 13 122:16,20
    York 1:1,7,23 2,6,8,23 3:5,5,9,19,20
    125:7 126:7

    x 52:7,24,25
    X's 138:11
    Y 5:2 9:1
    year 14 14,16,21,24 15:4 19 32,5,15
    21:5 24:11,16,22 29:5,15 33:23 6:18
    100:20 108:10 101 18:19 5:13 131:3
    years 11:12 12:7 13:24 14:11,21,20
    23:13 24:9,13,16 33:4 35:9 6:6
    73:17 99:11,23 116:24 136:4
    yellow 54:11 57:3 96:10 97:3 18:23
    York 1:1,23 2,6,8,23 3:5,5,9,19,20
    125:7 126:7
    yesterday 106:9
    Yonkers 17:3 11 18:24

    Z 5:2 9:1
    zone 117:6 131:21
    zoning 72:16,17

workers 58:8,19 74:14
    working 14:12,15 16:5 19:6 28:13
    33:4,6 34:13,17 58:19 77:14 120:19
    workmen 114:15
    works 1:3,5,14 3:8 20:4 28:13,20 29:17
    38:10,40 16 42:14 46:9 47:6 52:6,16
    43:9,10,11 58:8,22 64:19,24 65:7,21
    62:9,16,21 67:19,23 68:4,7,92:5
    126:16
    world 124:23
    worldn't 83:8
    write 33:14,17
    written 41:21
    wrong 74:17 81:10,11 90:18

    X 52:7,24,25
    xxxx 4:1 18,10

    Y 5:23 9:2
    year 14 14,16,21,24 15:4 19 32,5,15
    21:5 24:11,16,22 29:5,15 33:23 6:18
    100:20 108:10 101 18:19 5:13 131:3
    years 11:12 12:7 13:24 14:11,21,20
    23:13 24:9,13,16 33:4 35:9 6:6
    73:17 99:11,23 116:24 136:4
    yellow 54:11 57:3 96:10 97:3 18:23
    York 1:1,23 2,6,8,23 3:5,5,9,19,20
    125:7 126:7