# McCORMACK DECLARATION

# EXHIBIT K

# ORIGINAL

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
---------------------------------------------x
VASILIS AFTOUSMIS and CONSTANTIA AFTOUSMIS,    :

                   Plaintiffs,               :

                                Index No.
          -against-       102479/07  :

WONDER WORKS CONSTRUCTION CORP., and      :
FORTHRIGHT CONSTRUCTION, INC.,

                                     :

                Defendants.
---------------------------------------------x
FORTHRIGHT CONSTRUCTION, INC.,    :

               Third-Party Plaintiff,  :

          -against-               :

MMG DESIGN, INC., ATY INC., N & C IRONWORKS, :
INC., O.M.I. CONSTRUCTION CO., INC., and
MONACO CONSTRUCTION CORP.,             :

              Third-Party Defendants.  :
---------------------------------------------x
WONDER WORKS CONSTRUCTION CORP.,        :

          Second Third-Party Plaintiff, :

          -against-             :

MMG DESIGN, INC., ATY INC., N & C IRONWORKS, :
INC., O.M.I. CONSTRUCTION CO., INC., and
MONACO CONSTRUCTION CORP.,             :

         Second Third-Party Defendants.
---------------------------------------------x
            DATE:  May 13, 2008

            DEPONENT:  Mark Kanevsky
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
        BARRISTER REPORTING SERVICE, INC.
               120 Broadway
           New York, N.Y. 10271

             212-732-8066

EXAMINATION BEFORE TRIAL of the

Defendant/Third-Party Plaintiff, FORTHRIGHT

CONSTRUCTION, INC., by MARK KANEVSKY, taken by

the Plaintiffs, pursuant to Order, held at the

offices of Voute, Lohrfink, Magro & Collins,

LLP, 100 Park Avenue, New York, New York, on May

13, 2008, at 1:00 p.m., before a Notary Public

of the State of New York.

BARRISTER REPORTING SERVICE, INC.

120 Broadway

New York, N.Y. 10271

212-732-8066

3

```
 1
 2      A P P E A R A N C E S :
 3          LAW OFFICES OF STEVEN NEWMAN
                    Attorney for Plaintiffs
 4                  65 Broadway
                    Suite 825
 5                  New York, New York 10006
 6
            MC CABE, COLLINS, MC GEOUGH & FOWLER,
 7          ESQS.
                    Attorneys for Defendant/Second
 8                  Third-Party Plaintiff
                    WONDER WORKS CONSTRUCTION CORP.
 9                  346 Westbury Avenue
                    Carle Place, New York 11514
10
            BY:    MICHAEL SMAR, ESQ.
11
12          VOUTE, LOHRFINK, MAGRO & COLLINS, LLP
                    Attorneys for Defendant/
13                  Third-Party Plaintiff
                    FORTHRIGHT CONSTRUCTION, INC.
14                  170 Hamilton Avenue
                    White Plains, New York 10601-1789
15
            BY:    RALPH F. SCHOENE, ESQ.
16
17          CAMACHO MAURO MULHOLLAND, LLP.
                    Attorneys for Third-Party
18                  Defendant/Second Third-Party
                    Defendant
19                  MMG DESIGN, INC.
                    350 Fifth Avenue
20                  Suite 5101
                    New York, New York 10118
21
            BY:    JOSEPH O. TUFFY, ESQ.
22
23
24
25
```

4

1

2  A P P E A R A N C E S (Continued):

3      SCUNZIANO & ASSOCIATES, LLC
              Attorneys for Third-Party
4          Defendant/Second Third-Party
           Defendant
5          N & C IRONWORKS, INC.
           8403 13th Avenue
6          Brooklyn, New York 11228

7  BY:  NICHOLAS SCUNZIANO, ESQ.

8

   RIVKIN RADLER, LLP.
9          Attorneys for Third-Party
           Defendant/Second Third-Party
10         Defendant
           MONACO CONSTRUCTION CORP.
11         EAB Plaza
           Uniondale, New York 11556-0111

12
   BY:   FRANK J. GILIBERTI, ESQ.

13

14
                    xxxxx
15

16

17

18

19

20

21

22

23

24

25

9

1

2    M A R K    K A N E V S K Y ,

3            having been first duly sworn before a

4            Notary Public of the State of New

5            York, was examined and testified as

6            follows:

7

8    EXAMINATION BY

9    MR. NEWMAN:

10    Q.        Please state your name for the record.

11    A.        Mark Kanevsky.

12    Q.        What is your address?

13    A.        2681-A East 14th Street, Brooklyn, New

14    York 11221.

15    Q.        Good afternoon, sir.  My name is Steve

16    Newman.  I represent the Plaintiffs in this

17    case.  I'll be asking you a series of

18    questions, and these other lawyers might

19    follow-up if I'm not doing a complete job,

20    but I will try to do that.  I will give you a

21    couple of instructions, standard lawyer talk,

22    before we start.  All of your responses have

23    to be oral.  You can't gesture.  You have to

24    say something.

25            Do you understand what I just said to

1                        Kanevsky

2    A.      I don't pay attention to this number.

3    Approximately four or five years. .

4    Q.      When you say you are a principal of

5    Forthright Construction, Inc., what does that

6    mean?

7    A.      I'm a vice-president.

8    Q.      Have you been a vice-president of

9    Forthright Construction, Inc. for four or

10   five years?

11   A.      Yes.

12   Q.      Do you hold any other positions in

13   Forthright Construction, Inc.?

14   A.      No.

15   Q.      What do you do as a vice-president of

16   Forthright Construction, Inc.?

17   A.      Everything that I'm suppose to do as a

18   vice-president.

19   Q.      What is that?

20   A.      Can you clarify your question, please?

21   Q.      What do you do?  What is your job as

22   the vice-president of Forthright

23   Construction, Inc.?

24   A.      I have too many responsibilities.

25   Q.      Okay.

27

```
 1                    Kanevsky
 2          What are they?
 3    A.    They're related to Quentin Terrace
 4    project.
 5    Q.    What job functions are related to
 6    Quentin Terrace project?  What do you do?
 7    A.    As vice-president I oversee the
 8    project from the very beginning stage.  Then
 9    in the construction stage I do interfere with
10    people who are involved in the design, as the
11    architects and engineers, and also the
12    subcontractors who do the actual work.
13    Q.    When you say that you oversaw or
14    oversee the project on Quentin Road, what
15    does that involve?  What have you done?
16    A.    Physically oversee the project.  Be on
17    the job site, look exactly at what's going on
18    at the job site, have a report from my
19    supervisors.  Control everything that's going
20    on at the job site.  You can put it in one
21    word, everything.
22    Q.    When did you start to oversee the
23    project on Quentin Road?
24    A.    In the very beginning.
25    Q.    Which was when?
```

28

1                    Kanevsky

2    A.      2004.

3    Q.      Now, in 2004 was Forthright

4    Construction, Inc. the general contractor, a

5    subcontractor?  What was their role for the

6    construction project at Quentin Road?

7    A.      I would say general contractor.

8    Q.      What was Wonder Works in relation to

9    Forthright?

10   A.      Wonder Works is a general contractor

11   on the same job.

12   Q.      So, your testimony is that there were

13   two general contractors working the job on

14   Quentin Road; is that correct?

15   A.      You can say so.

16              MR. NEWMAN:  Let's have this

17        marked as Plaintiff's Exhibit 1.

18              (Whereupon a photograph was

19        marked Plaintiff's Exhibit 1, for

20        identification as of this date.)

21   Q.      Sir, I'm showing you what has been

22   marked as Plaintiff's 1, and this is a

23   photograph of a sign.  I'm asking you have

24   you ever seen that sign before?

25   A.      Yes.

37

Kanevsky

1

2     Q.      What did that entail?  What are the

3     specifics that you did?  What are the

4     specifics that you did starting from 2004?

5     A.      I already answered this question.  I

6     oversee the whole project.

7     Q.      What did that entail?  What did you

8     do?

9     A.      I oversee the whole project.  I

10    physically built the building.

11    Q.      You physically built the building?

12    A.      That's what it means.

13    Q.      Take me through that.

14            When you say you physically built the

15    building, were you responsible for doing the

16    excavation?

17    A.      Yes, I do.

18    Q.      Were you responsible for doing the

19    underpinning?

20    A.      Yes, I do.

21    Q.      Were you responsible for building --

22            MR. SCHOENE:  I'll make an

23            objection to the word responsible.

24            I'm not sure what you mean by that

25            word.  I will not direct him not to

38

1                      Kanevsky

2          answer, but I object to form as to

3          what responsible means.

4                      MR. NEWMAN:  Okay.

5     Q.    Let me ask you this.

6          What did you do in terms of excavating

7     the ground adjacent to 97 Quentin Road?

8     A.    I already told you.  I already

9     explained.  I physically oversee the whole

10    project on the job site.  If somebody did the

11    actual work, I was there to check and make

12    sure the job was done accurately.

13    Q.    When it came to excavation of the

14    ground adjacent to 97 Quentin Road, who did

15    you oversee?

16                I'll ask it again.

17          Was there a company or an individual

18    that excavated the ground next to 97 Quentin

19    Road?

20    A.    Everybody who used to be on the

21    project was under my supervision.

22                      MR. SCHOENE:  He wants to know

23          who did the excavation.

24    Q.    Who did the excavation?

25    A.    ATY.

40

1                      Kanevsky

2      A.      Yes, I did.

3      Q.      Do you recall what did you contract

4   with ATY Inc. to do at Quentin Road?

5      A.      Original contract was started from

6   excavation and foundation.  We also extend

7   this contract to underpinning and shoring.

8      Q.      When did ATY Inc. begin to work on the

9   project?  When I'm talking about the project,

10  I'm talking about the work being performed

11  adjacent to 97 Quentin Road.

12     A.      I believe it was the end of 2004.  I'm

13  not sure.

14     Q.      Before ATY Inc. began to perform work

15  somewhere around the end of 2004, was there

16  any other work that was performed at the site

17  adjacent to 97 Quentin Road?

18     A.      I don't think so.

19             MR. SCHOENE:  Do you mean by

20         other companies before that?

21             MR. NEWMAN:  No.  Just any work.

22             MR. SCHOENE:  By ATY you said.

23             MR. NEWMAN:  No.  I will clarify

24         now.

25             MR. SCHOENE:  I think the answer

41

1          Kanevsky

2          will be different depending on the

3          question.

4                    MR. NEWMAN:   I think Counsel is

5          right, that I'm not being clear

6          enough.

7    Q.     I'm simply asking, was the first work

8    done adjacent to 97 Quentin Road excavation

9    work?

10   A.     No.

11   Q.     What was the very first work that was

12   done adjacent to 97 Quentin Road?

13   A.     Demolition.

14   Q.     Fair enough.

15          Who performed the demolition work?

16   A.     MMG.

17   Q.     MMG Design?

18   A.     MMG Design.

19   Q.     Who contracted with them?

20   A.     I did.

21   Q.     Did you literally enter into a written

22   contract with them, them being MMG Design,

23   Inc.?

24   A.     Yes.

25   Q.     When was that?

48

```
1                    Kanevsky

2      constructed?

3      A.      Sure.

4      Q.      What company did the underpinning?

5      A.      ATY.

6      Q.      How long did it take for ATY to do the

7      underpinning?

8      A.      I don't remember.  It took a few

9      months.

10              MR. SCHOENE:  May I just

11              interject?

12              Was there more than one company

13              that did underpinning?

14              THE WITNESS:  Yes.  We started

15              with Monaco.  They worked with us for

16              two or three days, and that's it.

17              They didn't work anymore over there.

18              MR. NEWMAN:  Let's mark the

19              diagram as Plaintiff's Exhibit 2.

20              (Whereupon a diagram drawn by

21              Mr. Kanevsky was marked Plaintiff's

22              Exhibit 2, for identification as of

23              this date.)

24      Q.      Are you familiar with a company named

25      Monaco Construction Corp.?
```

51

1                    Kanevsky

2    excavation work?

3    A.      Say it again, please.

4    Q.      The reason that Monaco Construction

5    Corp. never performed any of the excavation

6    work, was it because they got into some sort

7    of dispute with MMG Design?

8                    MR. GILIBERTI:  Objection.

9                    MR. SCHOENE:  Are you aware of

10           any dispute that occurred between MMG

11           Design and Monaco?  Yes or no?

12                   THE WITNESS:  I heard that

13           Monaco didn't work for MMG Design

14           anymore.  So, they left.

15   Q.      Do you know what the problem was?

16   What the dispute was?

17   A.      I don't know.

18   Q.      We'll move on.

19           After Monaco Construction Corp. was no

20   longer employed by MMG Design, is that when

21   you contracted with ATY Inc. to do excavation

22   work?

23   A.      Yes.

24   Q.      Were you there on-site everyday that

25   ATY did the excavation and the underpinning

52

1                          Kanevsky

2    and the foundation work?

3    A.      Yes.

4    Q.      Did I get that right, that the first

5    thing that ATY Inc. did was excavation of the

6    site?

7    A.      No.

8    Q.      What's the first thing that ATY Inc.

9    did for the project?

10   A.      It's a standard procedure.

11   Underpinning.

12   Q.      Before they did the underpinning, did

13   they have to excavate the ground adjacent to

14   97 Quentin Road?

15   A.      No.  They can't.

16   Q.      So, the very first thing that ATY Inc.

17   did on the project was underpinning?

18   A.      Yes.

19   Q.      Did you observe the underpinning?

20   A.      Sure.

21   Q.      Tell me what you observed.  What did

22   ATY Inc. do to underpin?

23   A.      It's a difficult question.

24   Q.      I will break it down for you.

25           Where did the ATY Inc. underpinning

57

1                      Kanevsky

2     building.  In order to be able to do the

3     excavation, the nearest property -- this

4     process involve partial -- okay -- partial

5     support in a certain type of existing

6     foundation.  This process moves along the

7     property as far as the previous part is done.

8     Each part usually takes two, three, four

9     days.  This process involves partial of

10    digging under the foundation, filling those

11    digging holes with reinforced concrete and

12    dry packing of the gap between existing

13    foundation and new underpinning.  That is

14    what underpinning means.

15    Q.      Did you observe all of what you just

16    described occur in the underpinning that was

17    performed adjacent to 97 Quentin Road?

18    A.      Yes.

19    Q.      Did you observe it literally everyday

20    that the underpinning was performed?

21    A.      Yes.

22    Q.      Did you take any pictures?

23    A.      Yes.

24    Q.      Where are those pictures?

25    A.      Oh, we have a lot of them.

65

1                          Kanevsky

2      well?

3                     MR. SMAR:   Objection.

4      Q.      Was there anyone with you when you

5      inspected 97 Quentin Road for the first time?

6      A.      I don't remember, but one of the

7      representatives of Wonder Works was there.

8      So, we inspected on a daily basis.

9      Q.      I'm not asking you about on a daily

10     basis.  I'm asking you about the first time

11     you inspected --

12     A.      I don't remember, sir.

13     Q.      Let me get the question out.

14             The first time you inspected 97

15     Quentin Road did you inspect the interior of

16     the building 97 Quentin Road?

17     A.      Only whatever was visible.

18     Q.      Let me be clear.

19             Sir, were you dealing with anyone in

20     particular on a regular basis who was

21     employed by Wonder Works when overseeing the

22     project?

23     A.      Yes, I do.

24     Q.      Who were you dealing with at Wonder

25     Works?

69

1                    Kanevsky

2   site.

3   Q.      In doing the work was there any title

4   that was given to you?  If somebody said I

5   want to see the construction manager, would

6   that be you?  Did you have a title?

7   A.      I have to do everything.

8   Q.      I'm just asking.  If the answer is no,

9   the answer is no.  No problem.

10  A.      Okay.

11  Q.      Is it fair to say you supervised the

12  underpinning?

13  A.      Yes.

14  Q.      Did you supervise the excavation?

15  A.      Yes.

16  Q.      Did you supervise the construction of

17  the foundation?

18  A.      Yes.

19  Q.      You testified earlier in describing

20  underpinning that one of the components of

21  the underpinning is dry packing.

22  A.      Yes.

23  Q.      Describe to me what dry packing is.

24  A.      Dry packing is a material which is not

25  as a regular concrete shrinks.  So, after the

77

1                      Kanevsky

2    construction?  Everything was perfect?

3    A.      The building is perfect.  It's still

4    standing.  It did not come down.

5    Q.      From when the job first began -- we'll

6    go back to the underpinning in a moment --

7    how long was it to take from the demolition

8    to the completion of the building?  How long

9    was that?

10   A.      Four years.

11   Q.      Four years?

12   A.      About.

13   Q.      In your educational background and

14   your experience working as a construction

15   manager in the United States, is that a

16   normal amount of time to build a building the

17   size of the building adjacent to 97 Quentin

18   Road?

19   A.      There is no standard on it.

20   Q.      Are there documents that show that the

21   plan was to take four years to construct the

22   building?

23   A.      The plans don't show any dates.

24   Q.      Were there any delays encountered at

25   anytime in constructing this building?

93

1                          Kanevsky

2              the answer as not responsive.

3    Q.       Let me ask it again.

4              You testified that there were

5    violations that were issued, and I'm asking

6    you do you know if the Department of

7    Buildings or the Environmental Protection

8    Board ever found at a hearing that those

9    violations were legitimate?

10   A.       I don't recall any particular

11   violations.  So, I would say no.

12   Q.       Now, did you ever get the chance to

13   inspect prior to demolition adjacent to 97

14   Quentin Road the interior of 97 Quentin Road?

15   A.       No.

16   Q.       Did you ever inspect the interior of

17   97 Quentin Road?

18   A.       Yes.

19   Q.       When?

20   A.       Probably 2006 or late 2005.  Something

21   like that.

22   Q.       Did you inspect the interior of 97

23   Quentin Road alone or with somebody else?

24   A.       With somebody else.

25   Q.       Who else?

94

1                    Kanevsky

2    A.      I believe the person was a super at

3    that building.

4    Q.      How did you get entry to 97 Quentin

5    Road in the time that you're describing?

6    A.      He invited me.

7    Q.      Did you get in contact with him, or

8    how did you get to know who the super was?

9    A.      He simply catch me on the job site and

10   asked me to take a look at something.

11   Q.      So, the super approached you?

12   A.      Yes.

13   Q.      The super of 97 Quentin Road

14   approached you and asked you to look at

15   something.  What did he say to you when he

16   approached you at the job site?

17   A.      He brought me to the basement.  So, I

18   had a chance to look at the basement, but the

19   super at that time used to work as a finish

20   guy on doors.  He used to paint the doors,

21   and he had showed me his job and he offered

22   me his help.  He asked me to do the job on

23   the project.

24   Q.      He approached you on the job site, the

25   super for 97 Quentin Road, because he was

1              Kanevsky

2     looking for work?

3     A.     Yes.

4     Q.     Did you offer him work?

5     A.     I told him when the time came, why

6     not.

7     Q.     Besides for that, besides for the

8     super asking you for work, did he ask you to

9     come and look inside 97 Quentin Road or did

10    you initiate that inspection?

11    A.     Ask me again.

12    Q.     The first time you met the super at 97

13    Quentin Road you said he met you on the job

14    site and asked you basically for work; is

15    that correct?

16    A.     Yes.

17    Q.     Did something else happen in that

18    initial interaction between you and the super

19    that led you to inspect the interior of 97

20    Quentin Road?

21    A.     Yes.  I found that through the

22    foundation wall you can see outside through

23    the cracks, and I asked him what kind of

24    crack is that?  How long is that crack there?

25    Q.     I appreciate what you're saying, and I

102

1                          Kanevsky

2    A.      At that time, no.

3    Q.    When was the next time you were in the

4    interior of 97 Quentin Road?

5    A.      I was in there a few times.  I can't

6    recall exactly.

7    Q.      About how many times were you in the

8    interior of the building?

9    A.      Two, three, four.

10   Q.      How did you get in on the other times?

11   Was the super always letting you in or

12   something else?

13   A.      I believe another time again with the

14   super, and another time the owner of the

15   building.

16   Q.      What was the purpose of going into 97

17   Quentin Road after your initial visit?  What

18   was the purpose?  Why did you visit the

19   interior of 97 Quentin Road after the first

20   time?

21   A.      Okay.  He probably asked me about

22   complaints of the work.

23   Q.      The owner complained?

24   A.      Yes.

25   Q.      How did you hear that the owner was

1                         Kanevsky

2    complaining?

3    A.        He stopped by.  He explained to me all

4    his complaints.

5    Q.        What's the owner's name?

6    A.        I don't know.

7    Q.        When was the first time the owner

8    complained to you?

9    A.        He wasn't actually complaining.  He

10   had concerns.  I would say he had concerns.

11   Q.        What were the concerns of the owner?

12   A.        Same, cracks.

13   Q.        Cracks in the basement?

14   A.        Yes.

15   Q.        What exactly in expressing his

16   concerns to you did the owner say to you?

17   A.        He saw the cracks.

18   Q.        He said I saw cracks in the basement?

19   A.        Yes.

20   Q.        Did he say anything else to you?

21   A.        Anything else?

22   Q.        Yes.

23   A.        Yes.  He said I see the cracks, and I

24   have a concern about those cracks.

25   Q.        What did you say?

104

1              Kanevsky

2    A.      I explained to him my opinion how

3    those cracks could appear, and I also offered

4    to him when we finish our work to fix

5    anything in the building.  Same thing that we

6    offer all other neighbors who were around the

7    property, and we kept our word.

8    Q.      That's excellent.

9            MR. SCHOENE:  There was no

10           reason for that.

11           MR. NEWMAN:  It was a comment.

12   I'm not allowed to make a comment?

13           MR. SCHOENE:  No.

14           MR. NEWMAN:  Strike the comment.

15   It's not allowed at the deposition.

16   Q.      You said you had an explanation for

17   the cracks.  What was the explanation that

18   you gave?

19   A.      From my point of view that building

20   used to have very poor maintenance.

21   Q.      Poor maintenance.  Okay.

22   A.      Not poor maintenance.  Very poor

23   maintenance, first of all, and the second,

24   very poor quality of building.  For example,

25   in the same cracks that we're talking about

128

1                           Kanevsky

2    A.      Yes.  This is the piles that I used to

3    talk about, and this is the crack along the

4    piles.

5    Q.      When was the first time you saw that

6    crack on the cement slab as depicted in Photo

7    Number 2?

8    A.      I don't remember.  It was much earlier

9    than the first time I went in the basement

10   with the owner.  I'm sure I saw it before.  I

11   didn't inspect the basement, but I'm sure I

12   saw this.

13   Q.      Before you were in the basement with

14   Bill Aftousmis?

15   A.      With Bill Aftousmis.  I used to be in

16   the basement before Bill Aftousmis a few

17   times, one or two times.  I definitely saw

18   this crack before.

19   Q.      Did you ever put any crack monitors

20   down on any part of Bill Aftousmis' building?

21   A.      Yes, from my side.

22   Q.      Why did you do that?

23   A.      Because when they point me to the

24   cracks, I had to monitor the cracks.  In this

25   case I was able to assess those cracks were

129

1                          Kanevsky

2    movable, still movable.  So, it belongs to

3    any activities, or are they stable.  That

4    means they not belong to any activity as

5    excavation and underpinning.  So, I monitored

6    those cracks, and I do have a picture of

7    those monitors.

8    Q.       What did the crack monitors show?

9    A.       They didn't move they showed.

10   Q.       Where did you put the crack monitors?

11   A.       On a few places on this wall.

12   Q.       How many?

13   A.       There was a few of them.

14   Q.       Did you do any monitoring of Bill

15   Aftousmis' building during the excavation?

16   A.       Yes, I do.

17   Q.       What kind of monitoring did you do

18   during the excavation?

19   A.       Okay.  During when I hammered the

20   piles, and the piles went on this line --

21   Q.       Yes.

22   A.       -- I hired a company that monitored

23   the vibration of the ground.

24   Q.       What was the name of the company?

25   A.       I don't remember.  It's in my records.